**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 95-20170

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

WALTER GARCIA, VICTOR HUGO ALEGRIA, CARLOS
CAMACHO AND AGUSTIN VIVAS-GARCIA

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

June 12, 1996

Before POLITZ, Chief Judge, REYNALDO G. GARZA, and JONES, Circuit
Judges.

REYNALDO G. GARZA, Circuit Judge:

Appellants were convicted for participating in a conspiracy to
possess 166.9 kilograms of cocaine with the intent to distribute
it.  Appellant Carlos Camacho was also convicted of being an
illegal alien in possession of a firearm and ammunition, and for
using a firearm during a drug transaction.  Appellants have
appealed from their convictions on several grounds.  Having read
the briefs, reviewed the record and considered the arguments of
counsel, we AFFIRM all of the appellants' convictions and sentences
with the exception of Carlos Camacho's conviction for using a
firearm during a drug transaction.  We REVERSE Carlos Camacho's

conviction for using a firearm during a drug transaction, and VACATE the sentence imposed upon him for that conviction.

I. FACTS

Walter Garcia ("Garcia"), Victor Alegria ("Alegria"), Carlos Camacho ("Camacho") and Agustin Vivas-Garcia ("Vivas") were convicted of conspiracy to possess cocaine with intent to distribute it, as well as aiding and abetting the possession of cocaine with the intent to distribute it. Camacho was also convicted of the unlawful use of a firearm during the commission of a drug offense, unlawful possession of a firearm by an illegal alien and unlawful possession of ammunition by an illegal alien. The defendants appeal from those convictions.

The police began surveillance of Garcia and Vivas when they observed the two men at a payphone while they were conducting surveillance on another suspected drug dealer on May 25, 1994. During the next month, law enforcement agents conducted surveillance on the two men. The agents determined that neither man was regularly employed, and that Garcia lived at a residence at 7318 Northleaf (the "Northleaf residence"). Their conclusion that Garcia lived there was later bolstered when they discovered that the electricity for the residence was in Garcia's name.

On June 29, 1994, while the agents were conducting surveillance, Garcia arrived at the Northleaf residence in a Chevrolet Cavalier at 9:00 a.m. He was followed by a gray pick-up truck occupied by two white males. The truck backed up onto the driveway and stayed for ten minutes.

2

At 10:15 a.m., Garcia left the Northleaf residence, picked up Vivas at the Coppertree apartments, and drove to a Popeye's fried chicken restaurant.  Garcia and Vivas exited the vehicle and entered Popeye's.  A short while later, Antonio Perez ("Perez") and Alegria arrived at Popeye's in a grey Honda Accord.  They parked the Accord next to the Cavalier, and entered the restaurant.  A few minutes later, all four men exited the restaurant.  Garcia then left Popeye's in the Accord, and the other three men left in the Cavalier.

Garcia drove the Accord to the Northleaf residence.  During the drive, he made a telephone call to the Northleaf residence on his cellular phone.  When he arrived at the Northleaf residence, Garcia pulled the Accord into the garage.  While the Accord was in the garage, two agents saw Camacho standing in the doorway, looking up and down the street.[1]  Garcia left in the Accord within ten minutes of his arrival.  The Accord was riding lower when he left than it had been when he arrived, which suggests that Garcia put something in the trunk while the Accord was in the garage.

Meanwhile, the Cavalier drove around in a manner that was believed to be a "heat run."  That is, the police believed that the Cavalier was attempting to conduct countersurveillance to determine whether the police were conducting surveillance.  At 12:45 p.m., the Cavalier arrived at a Jack-in-the-Box restaurant.  All three

---

[1]Camacho argues that the evidence is insufficient to show that he was looking out the door, because one of the three agents who testified did not see him looking out the door.  However, the jury was free to believe the two agents who testified that they saw him looking out the door rather than the one agent who did not.

3

occupants of the Cavalier entered the restaurant.  Five minutes later, Garcia arrived at the Jack-in-the-Box in the Honda.  Garcia then entered the Jack-in-the-Box.  A few minutes later, Vivas and Garcia departed in the Cavalier, while Alegria and Perez departed in the Honda.

The police stopped both vehicles a short while later.  A police officer searched the trunk of the Honda, where he found 98.6 kilograms of cocaine.  When the police discovered the cocaine, Alegria tried to eat a piece of paper containing several addresses and phone numbers, including the phone number of the Northleaf residence.  All four men were arrested.

The police then continued their investigation at the Northleaf residence.  Camacho allowed the police to search the residence.  During their search, the police found an additional 68.3 kilograms of cocaine in the utility room, as well as a scale, baking soda, tape and surgical masks.  The latter items were apparently used in the packaging of cocaine.  The police testified that a chemical smell, which they identified with cocaine, was detectable in the house.  The police also seized a .357 revolver loaded with hollowpoint bullets that Camacho was carrying in his waistband.

At trial, Garcia, Alegria, Camacho and Vivas were convicted, and Perez was acquitted.  The four convicted defendants now appeal from their convictions.


II.  DISCUSSION

    A.    THERE IS SUFFICIENT EVIDENCE TO AFFIRM THE DEFENDANTS' CONVICTIONS FOR CONSPIRACY AND AIDING ABETTING POSSESSION

4

OF COCAINE WITH THE INTENT TO DISTRIBUTE IT

All four defendants claim that there is insufficient evidence to support their convictions for conspiracy and for aiding and abetting possession of cocaine with the intent to distribute it. Each defendant claims to have been "merely present" during the drug transaction, and that there is no evidence linking any defendant to the cocaine. After reviewing the evidence, we find that the evidence is sufficient to support all of the defendants' convictions for conspiracy and aiding and abetting.

1. STANDARD OF REVIEW

This Court recently set out the applicable standard of review to be used to determine whether there is sufficient evidence to support a conviction. In *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995), this Court stated:

> In our review of the sufficiency of the evidence supporting the jury's verdict, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt. We recognize that the jury was free to choose among all reasonable constructions of the evidence, and we accept all credibility choices that tend to support the jury's verdict. We view the evidence, both direct and circumstantial, as well as all reasonable inferences from that evidence, in the light most favorable to the verdict. Moreover, we determine only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence. Further, the evidence need not exclude every reasonable hypothesis of innocence. However, we must reverse a conviction if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged.

To support a conviction for conspiracy to possess illegal narcotics with the intent to distribute them, the evidence must

5

support a finding that a conspiracy existed, that the accused knew of the conspiracy, and that he voluntarily joined it. *United States v. Limones*, 8 F.3d 1004, 1009 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1543 (1994). To support a conviction for possession of cocaine with the intent to distribute it, the evidence must support a finding that the defendant knowingly possessed cocaine with the intent to distribute it. *United States v. Tolliver*, 780 F.2d 1177, 1183 (5th Cir. 1986). To support a conviction for aiding and abetting possession with the intent to distribute, the evidence must support a finding that the accused aided and abetted both possession and distribution.

### 2. DISCUSSION

Each defendant claims to have been "merely present" during the cocaine transaction, and that there is insufficient evidence to link any of them to the cocaine. We disagree. Our review of the record found ample evidence to affirm each defendant's conviction.

Alegria claims that he was merely driving the Accord, which was not his car, and that there was no evidence that he knew that the Accord's trunk contained cocaine. However, Alegria did participate in the car swap, arriving at Popeye's in the Accord, leaving Popeye's in the Cavalier, and then reacquiring the Accord—which was loaded with cocaine—at Jack-in-the-Box. When he reacquired the Accord, the trunk was riding lower than before, which should have indicated to him that something was placed in the trunk during the car swap. Finally—and most incriminating—when he was stopped by the police he tried to destroy evidence by

6

attempting to eat a sheet of paper containing phone numbers and beeper numbers, including the phone number of the Northleaf residence. This evidence is sufficient to support his conviction.

Vivas claims that the evidence only supports a finding that he was conducting countersurveillance activity, not a finding that he participated in a conspiracy to possess cocaine with the intent to distribute it. He points out that this Court has held that evidence of countersurveillance activity, without evidence supporting the further inference that a defendant knew that he or she was conducting countersurveillance for a cocaine transaction, is insufficient to support a conspiracy conviction. *See United States v. Dean*, 59 F.3d 1479, 1487 (5th Cir. 1995). In this case, however, the evidence showed more than just countersurveillance activity. For example, Vivas' fingerprints were found on packages of cocaine found in both the Accord and at the Northleaf residence. These fingerprints, combined with his participation in the car swap, constitute sufficient evidence to affirm Vivas' conviction.

Garcia also claims to have been merely present during the cocaine transaction. His claim, however, is rebutted by the evidence presented at trial. There was testimony that Garcia lived at the Northleaf residence, where police found cocaine and cocaine paraphernalia, and that the Northleaf residence's electric bill was in Garcia's name. Further, Garcia called the Northleaf residence from his cellular phone while driving there from Popeye's. An officer testified that the Accord rode lower after Garcia left the Northleaf residence, supporting the inference that the car was

7

loaded with cocaine while parked there. The inference that Garcia knew about the cocaine is also supported by the presence of a chemical odor, which a government witness said came from the cocaine, at the Northleaf residence. Finally, Garcia's participation in the car swap—which, according to the testimony of the government's expert witness, is a common drug trafficking method used to minimize the risk of detection and to shield the main location where the drugs are kept—supports the jury's finding of guilt. All told, there is ample evidence to support his conviction.

Camacho claims that he was merely present at the Northleaf residence, and that there was no evidence that he knew about the cocaine. Several pieces of evidence, however, support the jury's finding that Camacho participated in the conspiracy to possess the cocaine with the intent to distribute it. First, Camacho was present at the Northleaf residence at the time of the cocaine transaction. The strong chemical odor also supports the inference that he knew about the cocaine, because he would have noticed the odor. Garcia called the Northleaf residence on his cellular phone while driving the Accord there, which supports the inference that he was calling to inform Camacho that he was about come to the residence to load the cocaine into the Accord. Further, two agents observed Camacho looking out the door of the Northleaf residence while the Accord was parked there. This supports the inference that he was looking out for law enforcement while Garcia was loading cocaine into the car. Finally, Camacho was carrying a .357

8

magnum when the police searched the Northleaf residence, which supports the inference that he was guarding the cocaine. All told, the evidence is sufficient to affirm Camacho's conviction.

    B.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING THE GOVERNMENT'S EXPERT TO OPINE THAT A LARGE COCAINE TRAFFICKING ORGANIZATION CONTROLLED THE SEIZED COCAINE

The trial court did not abuse its discretion in allowing Agent Bell, a government witness, to testify that the seized cocaine was controlled by a large drug trafficking organization. Agent Bell testified as to how most large drug trafficking organizations operate, and opined that a large cocaine trafficking organization controlled the cocaine that was seized in the present case. The defendants contend that such testimony was inadmissible under Federal Rule of Evidence 702, which requires expert testimony to be helpful, and under Federal Rule of Evidence 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues. . . ."

"The admissibility of expert testimony rests within the sound discretion of the district court and will be reversed only upon a clear showing of abuse of discretion." *United States v. Townsend*, 31 F.3d 262, 270 (5th Cir. 1994)(citing *United States v. Charroux*, 3 F.3d 827, 833 (5th Cir. 1993)), *cert. denied*, 115 S. Ct. 723 (1995). We have held that a narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug business so long as the testimony is helpful and its relevance is not substantially outweighed by the possibility of

9

unfair prejudice or confusion. *See United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir.), *cert. denied*, 115 S. Ct. 2011 (1995). Therefore, we will not disturb the trial court's ruling so long as it did not abuse its discretion in finding that Agent Bell's testimony was helpful, and that the testimony's relevance was not substantially outweighed by the possibility of unfair prejudice or confusion.

The trial court did not abuse its discretion in finding Agent Bell's testimony helpful. The defendants claimed that his testimony was not helpful because the jury could have drawn its own conclusion as to whether a large drug trafficking organization controlled the cocaine. We disagree. The average juror may not be aware that the presence of 166.9 kilograms of cocaine is indicative of a large drug trafficking organization, and may not be aware that large drug trafficking organizations commonly use "car swaps," "stash houses" and conduct "heat runs." Therefore, Agent Bell's testimony to that effect was helpful.

Further, the trial court did not abuse its discretion in refusing to admit the testimony under Rule 403. The defendants—without citing any authority—claim that Agent Bell's testimony impermissibly put an "expert's stamp of approval" on the government's theory. We disagree. Agent Bell's testimony was not unfairly prejudicial. In fact, it was no more prejudicial than expert testimony that we have approved in other cases. *See, e.g. United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 768 (1995)(affirming the admission of expert

10

testimony to the effect that a defendant's possession of scales during the purchase of thirty grams of cocaine was consistent with drug trafficking rather than personal consumption). We therefore hold that the trial court did not abuse its discretion in admitting the testimony.

C.    THE TRIAL COURT DID NOT ERR IN DETERMINING VIVAS' SENTENCE

We hold that the trial court did not err in determining Vivas' sentence. Vivas claims that the trial court erred calculating his base offense level based upon the total amount of cocaine seized from the Northleaf residence and the Accord. He argues that the trial court did not make the findings necessary to hold him accountable for the entire 166.9 kilograms of cocaine. We disagree. Our review of the record indicates that the trial court made the necessary findings, and that its findings were supported by the evidence in this case.

We review the factual findings made by the district court at the sentencing hearing for clear error. *United States v. Dean*, 59 F.3d 1479, 1494 (5th Cir. 1995). We review the district court's application of the sentencing guidelines de novo. *Id.*

Under U.S.S.G. § 1B1.3, Vivas is responsible for all quantities of cocaine with which he was directly involved and "all reasonably foreseeable quantities of [cocaine] that were within the scope of the criminal activity that he jointly undertook." In order to hold a defendant accountable for quantities of cocaine found in the possession of a third party, this Court requires that the district court find that the amount of cocaine be both

11

reasonably foreseeable to the defendant and within the scope of the jointly undertaken criminal activity for which the defendant is being sentenced. *Dean*, 59 F.3d at 1495. The district court can implicitly make such findings by adopting the presentence report. *United States v. Puig-Infante*, 19 F.3d 929, 943 (5th Cir.), *cert. denied*, 115 S. Ct. 180 (1994).

The district court made the necessary findings by adopting the presentence report. The presentence report indicated that the entire 166.9 kilograms of cocaine was reasonably foreseeable to Vivas, and that Garcia, Camacho and Vivas "aided one another in housing and transporting the total of cocaine, 166.9 kilograms, confiscated from both the residence and vehicle."[2] Thus, the district court implicitly made the findings necessary to base Vivas' offense level on the entire amount of cocaine when it adopted the presentence report.

We further hold that the district court did not err in adopting the findings contained in the presentence report. There was sufficient evidence to hold Vivas accountable for the cocaine seized in the Accord because he participated in the drug transaction involving the Accord. Further, there was sufficient evidence to hold Vivas accountable for the cocaine found at the Northleaf residence because Vivas' fingerprints were found on the

---

[2]Vivas claims that the presentence report contained no such findings. However, an addendum to the presentence report did contain such findings. Because the addendum to the presentence report was made on February 27, 1995, the findings contained in the addendum were adopted by the district court when it adopted the presentence report on March 6, 1995.

packages containing the cocaine.  Thus, the district court did not err in determining Vivas' sentence.

Vivas also contends that the trial court should not have been able to rely on the findings made in the presentence report because he disputed the findings.  He points out that we have stated that "[w]hen a defendant objects to particular findings in the presentence report, the sentencing court must resolve the specifically disputed issues of fact if it intends to use those holdings as a basis for its sentence." *United States v. Smith*, 13 F.3d 860, 867 (5th Cir. 1994).  Because he objected to the trial court's consideration of the entire 166.9 kilograms of cocaine, he argues, the trial court could not rely on the presentence report without resolving the issue of the amount attributable to him.  The trial court, however, resolved the disputed factual issue by specifically overruling Vivas' objection at the sentencing hearing.  Thus, we hold that the trial court properly relied upon the findings contained in the presentence report.

D.  THE DISTRICT COURT DID NOT ERR IN COMMENTING UPON CAMACHO'S NATIONALITY DURING VOIR DIRE

The district court did not err in mentioning that Camacho may be a Columbian during voir dire.  Camacho was charged with, and convicted of, being an illegal alien in possession of a firearm and ammunition.  He complains that the trial court became an advocate for the government by advising the jury during voir dire that he was Columbian.  He points out that the government had the burden of proving that he was an alien, and contends that the district court shifted that burden to Camacho through its voir dire questioning.

13

Under Federal Rule of Criminal Procedure 24, a trial judge "has broad discretion in the conduct of voir dire. . . ." *United States v. Black*, 685 F.2d 132, 134 (5th Cir. 1982)(per curiam). We will only overturn a conviction based upon the scope and conduct of voir dire if we find both that the trial court abused its discretion and that the rights of the accused have been prejudiced by that abuse. In this case, we find neither an abuse of discretion nor any prejudice to Camacho's rights.

Camacho complains about the following statement made by the district court during voir dire:

> For these defendants, Spanish is their first language, they are, all of them, I believe, from Columbia. . . . let me ask, first of all, if there is anybody here who feels that they may be biased or influenced somehow against these speakers because they are not native English speakers and because they are from Columbia, who feels that they might have some leanings against these folks or some bias against these folks because they are not English speakers and have some problem with the whole concept or notion of us using interpreters in this courtroom to assist these gentlemen in understanding these proceedings against them.

Camacho's attorney objected, stating

> I think it is the government's burden to prove where people are from, particularly since my client is accused of being an illegal alien. I am particularly concerned with that.

The trial court then instructed the jury as follows:

> All right, ladies and gentlemen, I indicated to you a few moments ago that I believe all of the defendants in this case were from Columbia and I may be mistaken on that. There is some indication that one or more of them may not be from Columbia, but may be from other Latin American countries.

The government responds by arguing that the trial court simply tried to discover if any venirepersons were prejudiced against

14

Colombians or other Spanish speakers. The government also points out that the trial judge never instructed the jury to find that Camacho was an alien, and that the trial court gave a cautionary instruction, telling the jury, "Nothing that the Court may say or do during the course of this trial or even during the voir dire examination today is intended to indicate nor should be taken by you as indicating what your verdict should be in this case." The trial court also instructed the jury as follows: "I don't want you to assume from anything that I have said or done during trial that I have any opinion whatsoever concerning any of the issues of this case."

We hold that the district court neither abused its discretion nor prejudiced Camacho's rights in its conduct of voir dire. We and our sister courts have encouraged—sometimes even required—trial courts to inquire about possible racial or ethnic prejudice during voir dire. *See, generally*, 2 Charles Allen Wright, *Federal Practice and Procedure* § 282 (1982). In this case, the trial court was simply inquiring about possible prejudice, not acting as an advocate for the government or instructing the jury to find that Camacho was an illegal alien. It was within the trial court's discretion to make such an inquiry. Further, we find that the curative instructions remedied any prejudice caused by the trial court's statements.

E. THERE IS INSUFFICIENT EVIDENCE TO SUPPORT CAMACHO'S CONVICTION FOR THE USE OF A FIREARM DURING A DRUG OFFENSE

There is insufficient evidence to support Camacho's conviction for the use of a firearm during a drug offense. Camacho claims

15

that the evidence is insufficient to convict him for the use of a firearm during a drug offense in violation of 18 U.S.C. § 924(c). The indictment alleged that Camacho "did knowingly use a firearm . . . during and in relation to a drug trafficking crime. . . ." A recent Supreme Court case held that mere possession does not constitute "use" under 18 U.S.C. § 924(c). *Bailey v. United States*, 116 S. Ct. 501 (1995). Rather, to convict a defendant for the "use" of a firearm during a drug transaction, the government must show an active employment of the firearm by the defendant. *Id.* at 508. Examples of "use" include "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* However, neither mere possession nor concealing a gun to be ready for an imminent confrontation constitute "use." *Id.* at 508-09.

The evidence is insufficient to convict Camacho for the "use" of a firearm. The evidence merely showed that he carried a concealed firearm, not that he used it in any way. Further, the only inference that can be drawn from that evidence is that he carried it while he was serving as a lookout while Garcia was loading the cocaine into the Accord. Under *Bailey*, this evidence merely shows possession, it does not show use. Therefore, the evidence is insufficient to affirm Camacho's conviction for "use" of a firearm during a drug offense.

The dissent claims that Camacho used the pistol by carrying it while he guarded the cocaine, and by reaching for it when Garcia inquired about the bulge in his waistband. We are forced to

16

disagree.

First, merely carrying the pistol is not the same as using it. Although the dissent correctly points out Section 924(c)(1) criminalizes both the use of a firearm and carrying a firearm during a drug transaction, we cannot agree that the words "use" and "carry" are synonymous. It is a "cardinal canon or statutory construction . . . that [in interpreting a statute,] the words of a statute will be given their plain meaning. . . ." *Texas Food Industry Assoc. v. United States Dept. of Agriculture*, 95-50060, slip. op. p. 3165, 3168 (5th Cir. April 30, 1996). The plain meaning of the word "use" is "the act or practice of using something," while the plain meaning of the word carry is "to hold, wear or have upon one's person." WEBSTER'S THIRD NEW INT'L DICTIONARY 343, 2523 (1981). In this case, although Camacho's concealing the pistol in his waistband constituted holding or wearing it upon his person (i.e. carrying it); it did not constitute "the act or practice of using it." *Id.* Thus, we conclude that merely carrying a pistol concealed in his waistband did not constitute the use of the pistol.

Second, we find that the evidence is insufficient to show that Camacho used the pistol by reaching for it when confronted by law officers. The only evidence from which the government argues that an inference that Camacho reached for the pistol may be drawn is the testimony of Officer Garcia. Officer Garcia testified that, when he asked Camacho about the bulge in his waistband,

> [Camacho] didn't respond . . . He kind of looked down and
> went for -- the shirt was over the bulge that was in his

17

> waistband. I went for the bulge real quick and just grabbed on to it. At that time, I knew it was the butt of the pistol. At that time, I took it out of his waistband.

During cross-examination, however, Garcia admitted that he did not know why Camacho was reaching toward his waist, that Camacho did not try to interfere with Garcia's taking the gun from his waistband, and that Camacho allowed Garcia to take the gun. Garcia's testimony is insufficient to show that Camacho used the gun by reaching for it. Had there been testimony that Camacho brandished the gun by pulling it out or threatening Garcia with it, then there would be evidence of use. But in this case, the fact that Camacho moved his hand toward his waistband for reasons unknown to Garcia before allowing Garcia to remove the pistol is insufficient evidence for a jury to find beyond a reasonable doubt that Camacho used the pistol.

The fact that Camacho could have been indicted under the same statute for carrying a firearm is irrelevant. Camacho was indicted for using a firearm, not for carrying one. Because there is insufficient evidence to show that he used a firearm during a drug transaction, we must reverse his 18 U.S.C. § 924(c) conviction.

III. CONCLUSION

We AFFIRM all of the appellants' convictions and sentences with the exception of Carlos Camacho's conviction for using a firearm during a drug transaction. We REVERSE Carlos' Camacho's conviction for using a firearm during a drug transaction, and VACATE the sentence imposed upon him for that conviction.

18

No. 95-20170 -- <u>USA v. Garcia</u>

EDITH H. JONES, dissenting in part:

19

Although I am pleased to concur in the majority of the panel's thorough opinion upholding these convictions and sentences, I must dissent on one point. I disagree with the panel majority that appellant Camacho's conviction for illegal "use" of a firearm during the drug offense must be reversed for insufficient evidence. As the government acknowledges an instructional error that requires reversal and remand, I believe that was the appropriate disposition of this count of conviction.

The majority likens Camacho's conduct to "mere possession" of a firearm, conduct which the Supreme Court found different from the active type of "use" contemplated by 18 U.S.C. § 924(c)(1). United States v. Bailey, ____ U.S. ____, 116 S.Ct. 501 (1995). With due respect, I believe Bailey was addressing factually distinct cases in which defendants had been charged with "use" of firearms that were hidden under mattresses, located in locked trunks of cars, and were otherwise stored and out of reach. See, e.g., United States v. Andrade, 95-2039, 5th Cir. slip op. p. 3587 (May 14, 1996). Such possessions of firearms, the Court said, were not "active use" as was contemplated in section 924(c).

Unlike the situation in Bailey, Camacho was personally armed with his pistol and was on duty guarding the large-scale cocaine conspirators' stash house when the officers arrived. As Camacho opened the door for them, one officer saw the bulge in his waistband underneath his shirt, suspected Camacho was armed, and reached to remove the pistol even as Camacho was himself reaching for it. Whether these acts constituted "brandishing" or

20

"displaying" a firearm presented, in my view, a jury question. If the jury believed that Camacho was armed with a pistol immediately available to him as he guarded the stash house, he was actively using it within the meaning of section 924(c)(1).

The majority acknowledges that Camacho could have been indicted for "carrying" the firearm under section 924(c)(1), and I agree that would have been possible. Bailey does not, however, specify that carrying and using firearms are mutually exclusive comes within the same statutory provision; rather, it held that use could not be interpreted so broadly as to subsume completely the crime of illegal carrying. No such problem arises on the facts of this case.

I would hold that because Camacho was personally armed during the course of his conduct in furthering the drug offense, he made "use" of the firearm in his waistband. I respectfully dissent.

21