# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 6, 2007

Charles R. Fulbruge III
Clerk

No. 06-40888

UNITED STATES OF AMERICA

        Plaintiff-Appellee

v.

JUAN SANCHEZ-HERNANDEZ, also known as Juan Enrique
Sanchez-Hernandez, true name Juan Carlos Almendariz-Corral,
true name Juan Carlos Armendariz-Corral

        Defendant-Appellant

Appeal from the United States District Court for the
Southern District of Texas, Laredo Division

Before DAVIS, WIENER, and PRADO, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant Juan Sanchez-Hernandez appeals his conviction of possession with intent to distribute marijuana, raising two issues. Sanchez-Hernandez argues that the district court improperly denied a challenge for cause of a biased prospective juror. He also argues that the district court improperly admitted drug profiling testimony as substantive evidence of guilt and allowed expert testimony regarding his mental state. Finding no reversible error, we affirm.

I.

Juan Sanchez-Hernandez was charged with one count of knowingly and intentionally possessing with intent to distribute marijuana (Count One), in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D), and 18 U.S.C. § 2, and one count of knowingly and intentionally importing marijuana into the United States from Mexico (Count Two), in violation of 21 U.S.C §§ 952 (a) and 960(b)(4), and 18 U.S.C. § 2. A jury found him guilty of Count One, but acquitted him of Count Two. Sanchez-Hernandez now appeals his conviction.

The government's case at trial was presented by four witnesses - the three agents who arrested Sanchez-Hernandez at the border, Haas, Bowen, and Mata, and Special Agent Edemeier of the DEA. Sanchez-Hernandez testified for the defense.

On the night of Sanchez-Hernandez's arrest, agents Haas, Bowen, and Mata were "laying-in" at a landing on the Rio Grande River commonly used by drug traffickers near El Cenizo, Texas. They were equipped with night vision goggles with magnification and could see toward the landing but not the landing itself. Around midnight Haas heard noise on the Mexico side and saw three men enter the river in a line and paddle with their hands in three inner tubes across the river. The first man had a small tote bag and was halfway across the river before the next two men entered the water. The next two men had larger bags that were square shaped and appeared to be heavy because their tubes sat much lower in the water than the first person's tube. Haas radioed Bowen and Mata to be on the lookout for them as they were headed in their direction. Haas then moved toward the expected landing site.

Bowen and Mata saw a man, not Sanchez-Hernandez, wearing a camouflage jacket walk quickly by Bowen's position. They lost sight of him briefly and then saw him heading back to the landing. About five to ten minutes later, two men came around the same landing carrying a large, green, square, military-style duffle bag. Each man was holding one handle of the bag with the bag between them. Sanchez-Hernandez was leading and the man who had been in the camouflage jacket was in the rear.

As they passed Bowen and Mata, Bowen stepped out of hiding and threw a "flash-bang" device, which lights up the area and creates a loud noise. The two men dropped the bundle and ran. Bowen chased the man who had been in camouflage toward the landing but did not catch him. Mata chased Sanchez-Hernandez, yelling "police," "immigration," and "stop" in Spanish, and eventually arrested him. The other men were not found.

Haas ran to the green duffle bag. The soft bag was stretched in a square shape conforming to the shape of the bundles in the bag. Upon opening the bag, Bowen saw cellophane used to wrap bundles - which were stipulated to be marijuana and weighed 75.8 pounds. Mata testified that he could smell the drugs a little bit. Near the duffle bag, the agents found a small bag that contained a camouflage jacket like the one the lead man had been wearing.

Over defense objections, agents submitted the following testimony relevant to Sanchez-Hernandez's second issue. Haas testified that a lead person who enters the water before the others in the group is ordinarily the scout who makes sure the coast is clear. This supported his conclusion that the crossing he witnessed in this case was a drug crossing, rather than an alien crossing. In drug crossings, a scout is used and the people crossing the river sit in the inner tubes with the drug packages in their laps. In alien crossings, the aliens put their clothing and other belongings in the inner tubes and swim in the river while holding onto the tubes. He said that in his experience he had never seen aliens and drugs crossing at the same time and concluded that what he had seen was solely a drug crossing.

Bowen testified, over defense objections, that the lead man was scouting for a narcotics load. In his experience, alien smugglers do not wear camouflage; they just come up and look and go back for the load. Because drugs are more valuable than aliens and penalties for drug smuggling are more severe, drug scouts have more to lose. They wear camouflage so they can hide. Bowen also

testified that the river landing they were watching was not used much for alien smuggling. Alien landing areas are known as such and are littered with clothes and tubes abandoned by the aliens once they enter the country. Drug smugglers don't leave any sign that they used a particular landing and unlike aliens cross back over the river with their tubes once they have delivered their loads. Bowen also testified that the green duffle bag was a type commonly used for narcotics smuggling.

Mata testified that the way Sanchez-Hernandez and the other man were carrying the duffle bag - with one holding each handle - is a way that he had seen drugs carried before. The advantage is that it allows the smugglers to drop the bag quickly and run if necessary.

Sanchez-Hernandez testified that the night of his arrest he was attempting to cross illegally into the United States.[1] He identified the lead person in the group as Luis whom he met through a friend. His friend asked Luis if he would take Sanchez-Hernandez into Laredo. Luis said he was going that night and it would cost $100. Sanchez-Hernandez said he only had $50, which Luis allegedly accepted.

Later that same day, Sanchez-Hernandez traveled in Luis' car with Luis and a third person Sanchez-Hernandez did not know. They stopped once to purchase garbage bags for their clothes. At some point, Sanchez-Hernandez and Luis got out of the car and the third person drove away. They continued on foot to the river where they were met by another person Sanchez-Hernandez did not know who had two inner tubes. They all stripped to their boxers and put their clothing in the plastic garbage bags. The third man put his small bag in the garbage bag with their clothes. The three men crossed in two inner tubes.

---

[1] At the begining of his testimony, Sanchez-Hernandez gave his true name as Juan Carlos Almendarez. We refer to him throughout this opinion as Sanchez-Hernandez, the name under which he was indicted.

4

Sanchez-Hernandez sat in Luis' lap with the clothing bag in his lap. The third man pulled a square looking bag out of the brush, which he carried in his lap as he crossed in the second inner tube. Luis and Sanchez-Hernandez crossed first. When they reached the U.S. side, they changed clothes. Luis had a "soldier's jacket" and looked around. When the third man arrived, Luis asked Sanchez-Hernandez to help Luis carry the bag. Sanchez-Hernandez said he didn't know what was in the bag but "didn't think that it was anything good" and "imagined that perhaps it was something bad." When Sanchez-Hernandez heard a "shot," he ran further into the U.S. until he was apprehended. He did not return to the river because he did not know how to swim.

## II.

Sanchez-Hernandez argues first that the district court abused its discretion by denying his challenge for cause of a prospective juror who indicated her belief that a person who had been arrested and indicted must be guilty. We need not consider whether the district court adequately rehabilitated this juror on further questioning. Sanchez-Hernandez elected to use one of his peremptory challenges to remove this juror from the panel. "[I]f the defendant elects to cure such an error [of the erroneous denial of a challenge for cause] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000).

Further, we reject Sanchez-Hernandez's argument based on Justice Souter's concurrence in Martinez-Salazar. Sanchez-Hernandez argues that the Supreme Court left open whether it is reversible error to refuse to afford a defendant an extra peremptory challenge when he has used a peremptory challenge to cure an erroneous denial of a challenge for cause and when he shows that he would otherwise have used all his peremptory challenges for

5

noncurative purposes. Id. at 317-18 (Souter, J. concurring). This argument is based on the following statement in Justice Souter's concurrence:

> I write only to suggest that this case does not present the issue whether it is reversible error to refuse to afford a defendant a peremptory challenge beyond the maximum otherwise allowed, when he has used a peremptory challenge to cure an erroneous denial of a challenge for cause and when he shows that he would otherwise use his full complement of peremptory challenges for the noncurative purposes that are the focus of the peremptory right. Martinez-Salazar did not show that, if he had not used his peremptory challenge curatively, he would have used it peremptorily against another juror. He did not ask for a make-up peremptory or object to any juror who sat. Martinez-Salazar simply made a choice to use his peremptory challenge curatively.

Id.

The Seventh Circuit, addressing an identical case, has concluded that Justice Souter's concurrence does not in fact leave open the question raised by Sanchez-Hernandez.

> Polichemi points out in his brief responding to the government's petition for rehearing that there is a factual difference between Martinez-Salazar's case and his own that might have been important, which Justice Souter highlighted in his concurring opinion. Martinez-Salazar and his co-defendant exhausted all of their peremptory challenges, but they failed to request any more (as they were entitled to do under Fed. R. Crim. P. 24(b)), and at the close of jury selection Martinez-Salazar's lawyer affirmatively told the district judge that he had no objections to the final list of jurors to be seated. Martinez-Salazar, 120 S. Ct. at 778. Polichemi and his co-defendants, in contrast, preserved their objections to the final jury and did request additional peremptories. But in the end, Martinez-Salazar's handling of his jury selection process was not what caused the majority of the Court to rule as it did. First, the Court noted that Martinez-Salazar received all the peremptory challenges to which he was entitled under Rule 24(b). Second, the Court stressed the fact that the ultimate jury was impartial. Third, just as in our case, there was no allegation that "the trial court deliberately misapplied the law in order to force the defendants to use a peremptory challenge to correct the court's error," or that the

district court's ruling "resulted in the seating of any juror who should have been dismissed for cause." 120 S. Ct. at 782.

Perhaps a majority of the Supreme Court will some day accept the distinction between curative and non-curative uses of peremptory challenges offered by Justice Souter, but in our view it did not do so in Martinez-Salazar. Just as in that case, the defendants here opted to use one of their peremptories to strike a juror who should have been eliminated for cause. That was a choice they were free to make, but the fact that it had its basis in an error by the district court does not amount to a violation under either Rule 24(b) or the Due Process Clause. We thus reject this argument for reversal, made by all four defendants, and move on to the remainder of their challenges to their convictions.

United States v. Polichemi, 219 F.3d 698, 705-706 (7th Cir. 2000).  We agree.

As applied to this case, Sanchez-Hernandez opted to use one of his peremptories to strike a juror that he believes should have been struck for cause. Sanchez-Hernandaez does not argue that either of the exceptions to the rule in Martinez-Salazar apply: (1) the trial court did not deliberately misapply the law in order to force the defendant to use peremptory challenges to correct the court's error, and (2) the district court's ruling did not result in the seating of any juror who should have been dismissed for cause. Martinez-Salazar, 528 U.S. at 316.  Accordingly, Sanchez-Hernandez has not been deprived of any rule-based or constitutional right by the district court's denial of his challenge for cause of a prospective juror.

### III.

Sanchez-Hernandez argues next that the district court abused its discretion by admitting as substantive evidence of guilt the opinion testimony of Border Patrol agents that the conduct of the participants indicated drug smuggling based on comparisons to a drug smuggling profile, as well as impermissible expert testimony regarding defendant's knowledge of the marijuana in the duffle bag.

The first issue to address is the standard of review. If the defendant objects, the district court's decision to admit testimony is reviewed for abuse of discretion and harmless error analysis applies. United States v. Gutierrez-Farias, 294 F.3d 657, 662 (5th Cir. 2002); United States v. Williams, 957 F.2d 1238, 1242 (5th Cir. 1992). The government asserts that as to the testimony of Agent Mata, plain error review applies because the defense did not object during his testimony. Agent Haas and Agent Bowen testified before Agent Mata. While Agent Haas was testifying, the defense objected repeatedly to improper opinion testimony and was granted a running objection to similar questions, which the district court overruled. When Agent Bowen took the stand, defense counsel referenced his objections from the day before (relating to Agent Haas' testimony) and clarified that his objections as to the testimony were on multiple grounds: "improper opinion testimony or expert testimony or profiling." When the district court overruled the objections, it again granted defense counsel's request for a running objection to this line of questions. Although the defense did not repeat its objections during Agent Mata's testimony, the prosecution's line of questions and Agent Mata's answers presented substantially the same type of information and opinions as the other agents. Our reading of the record persuades us that the district court gave defense counsel a continuing objection to this line of questions propounded to all three agents and at a minimum defense counsel was entitled to interpret the ruling in this way. See United States v. Fortenberry, 919 F.2d 923, 924-25 (5th Cir. 1990); Walker v. Messerschmitt Bolkow Blohm GmBH, 848 F.2d 496, 497 (5th Cir. 1988). Accordingly, the issue was preserved for appeal and an abuse of discretion and harmless error analysis applies. Gutierrez-Farias, 294 F.3d at 662; Williams, 957 F.2d at 1242.

The government characterizes the agent's testimony as expert testimony under Federal Rule of Evidence 702 about the modus operandi of drug smuggling on the Rio Grande River. Expert testimony is allowed if "scientific, technical or

other specialized knowledge will assist the trier of fact to understand the evidence." FED. R. EVID. 702. Law enforcement witnesses are thus allowed to give testimony about "the significance of certain conduct or methods of operation unique to the drug business so long as the testimony is helpful and its relevance is not substantially outweighed by the possibility of unfair prejudice or confusion." United States v. Garcia, 86 F.3d 394, 400 (5th Cir. 1996) ("The average juror may not be aware that the presence of 166.9 kilograms of cocaine is indicative of a large drug trafficking organization, and may not be aware that large drug trafficking organizations commonly use 'car swaps,' 'stash houses,' and conduct 'heat runs.'").

However, expert testimony may not be offered as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged. Fed. R. Evid. 704(b). A "drug courier profile" is "nothing more than a compilation of characteristics that aid law enforcement officials in identifying persons who might be trafficking in illegal narcotics." Williams, 957 F.2d at 1242. Expert testimony establishing drug courier profiles is generally considered inherently prejudicial "because of the potential they have for including innocent citizens as profiled drug couriers." Id. (internal quotation marks omitted). Drug courier profile testimony is "inadmissible to prove substantive guilt based on similarities between defendants and a profile." United States v. Brito, 136 F.3d 397, 412 (5th Cir. 1998).

In drug profile cases law enforcement personnel usually testify that because the defendant's conduct matches the profile of a drug courier, he knew about the drugs he was transporting. For example, in Williams, the testifying officer described the drug courier profile that he used to identify Williams at Dallas-Ft. Worth airport and listed the characteristics of the profile that Williams displayed. 957 F.2d at 1241. The officer testified that Williams looked nervous as he deplaned in Dallas from an incoming flight from Los Angeles. Id.

at 1240. He walked slowly and looked over his shoulder as he walked. Id. When the officer approached, identified himself, and asked to see his ticket, Williams took the ticket out of the airline ticket folder, which was unusual. Id. Williams' hand was shaking as he handed the officer the ticket. Id. The ticket had been purchased with cash and was a one way ticket to Baton Rouge, connecting in Dallas. Id. at 1240-41. It was clear from the context in which the evidence was presented that it was presented as substantive evidence of guilt. Id. at 1241. We found the admission of this testimony to be in error. Id. at 1242.

In Gutierrez-Farias, the agent testified that drug kingpins have managers who work for them and that people higher up in the organization hire others to transport the drugs. 294 F.3d at 662. When looking to hire someone, they start with someone that they know and trust because of the value of the product they are transporting. Id. This evidence was used to prove that the defendant knew about the drugs he was transporting and was not expert testimony. Id. This court characterized the prohibited testimony as follows: "In most drug cases, the person hired to transport the drugs knows the drugs are in the vehicle." 294 F.3d at 663. Admitting it was an abuse of discretion.

In United States v. Mendoza-Medina, 346 F.3d 121 (5th Cir. 2003), the testimony was less direct. The agent testified that

> (1) managers in charge of transportation recruit people to transport drugs; (2) the amount of drugs in a load depends on the person's narcotics transporting experience, for example, new recruits carry 200 to 300 pounds of marijuana; (3) trust between the distributor and driver is an essential component; and (4) narcotics traffickers bring their wives and children along to mask the drug trafficking offense.

Id. at 127-28. Admission of this testimony was an abuse of discretion under the same reasoning.

Although the agents' testimony came close to crossing the line into drug profiling evidence because of its tendency to imply the defendant's knowledge of

the drug activity, we conclude that under the circumstances of this case, the district court did not abuse its discretion by admitting the agents' testimony. We view the testimony in this case as more like that in Garcia because the officers were explaining to the jury based on their experience in patrolling the U.S.-Mexico border in that area how drug smuggling operations were conducted. The officers testified that in an alien crossing, several aliens are grouped together and hang on to a single inner tube. In drug crossings, the participants generally cross with one person on each tube, which the agents testified occurred in this case. The lead person in a drug smuggling outfit typically wears camouflage so he can hide if trouble is encountered. The agents identified the landing at issue as one used solely for drug crossings because no clothes or inner tubes were abandoned on the site which they would expect to find at a landing used by illegal aliens. The duffle bag was the type used by drug smugglers and when carried across the river weighed the inner tube down more than a bag of clothing would. This evidence falls within the guidelines of Fed. R. Evid. 702. because it is based on specialized knowledge of the agents gained through their experience in apprehending drug smugglers and aliens who have just crossed the Rio Grande. The agents' testimony based on their knowledge and experience could assist the trier of fact to understand the evidence.

In addition, the testimony was not pure profile evidence offered for the purpose of proving the defendant's guilt based on his comparison to a profile. Rather this evidence served to rebut Sanchez-Hernandez's innocent (at least as to the drug charges) explanation that he was attempting to enter the country to work and was not involved in smuggling drugs on the river that night. See United States v. Buchanan, 70 F.3d 818, 833 n.19 (5th Cir. 1995) (testimony that a person transporting $30,000 worth of crack cocaine and multiple firearms would not allow a complete outsider to ride in the car is permissible opinion

testimony offered to indicate that the defendant's actions were inconsistent with his claim that he was an innocent bystander).

The government avoided extracting an impermissible opinion from the agents that drug transporters would not allow an outsider to participate in the importation of drugs. Although the government did make this argument to the jury in closing, we see no error. Our cases criticize the admission of direct testimony of this type, but we have not held that the government cannot argue this inference when a defendant is entrusted with illicit drugs or is given a role in their distribution and claims that he did not know that the drugs were present or was duped into playing a role in their movement.

The district court did not abuse its discretion in admitting the challenged testimony.

IV.

For the foregoing reasons, Sanchez-Hernandez's conviction is AFFIRMED.