**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 26, 2012

No. 10-41167

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CESAR OMAR MONTES-SALAS,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Cesar Omar Montes-Salas appeals his conviction on four counts related to illegal alien trafficking, challenging his conviction on two grounds. First, Montes-Salas maintains that the district court erred in admitting expert testimony by two federal law enforcement agents regarding (1) the usual locations of passengers in the vehicles used to transport illegal aliens; (2) the use of multiple bailouts in illegal alien trafficking; (3) the role of guides; and (4) the relationships among drivers, guides, and recruiters. Second, he argues that an agent's statement identifying a particular phone number as belonging to Montes-Salas's unindicted co-conspirator was inadmissible double hearsay because the agent was merely repeating what another agent had told him and the other

agent, in turn, had merely repeated information provided by the sister of one of the illegal aliens apprehended with Montes-Salas.  We affirm.

## I.

A grand jury indicted Cesar Montes-Salas on four counts: conspiracy to unlawfully transport illegal aliens, conspiracy to conceal or harbor illegal aliens, and two counts of harboring or concealing illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (iii), (v)(I), and (a)(1)(B)(I).

At trial, Border Patrol Agent Eluid Rodriguez testified that on January 12, 2010, he was conducting a roving patrol on a highway notorious for alien dropoffs and alien smuggling with three other agents: Nestor Yanez, Daniel Santos, and Roman Paz. When they stopped at Highway 281, a red Dodge Ram pickup truck passed the agents, heading north on Highway 281.  Although only two passengers in the truck were visible, the pickup was riding low in back.  As the agents pulled alongside the pickup truck, Rodriguez observed that the driver (later identified as Montes-Salas's co-conspirator, Jose Ivan Hernandez-Torres) had a rigid posture.  Montes-Salas was sitting in the passenger's seat, and the driver was speaking to Montes-Salas but not looking at him.

Agent Rodriguez instructed Agent Yanez to slow down to allow for a check of the license plate.  While he was waiting for the results, Agent Rodriguez observed two adult male heads pop up and back down in the truck.  In Agent Rodriguez's experience, it was common for back seats to be removed from trucks in order to hide illegal aliens.  Agent Rodriguez decided to stop the truck, but it made an abrupt turn, hit a crossover, and slowed down, at which time two people jumped from the front passenger door and fled.  Agent Rodriguez approached the truck as it was slowing and attempted to open the driver's door.  As he reached the door, the truck sped away.  Agent Rodriguez identified Montes-Salas as one of the two individuals who fled the truck.  The other individual appeared to be a young, thin male wearing dark clothing.

Agents Paz and Santos also testified that when their vehicle first pulled up alongside the red pickup, they had seen Montes-Salas sitting in the passenger seat. After the door to the red pickup opened and Montes-Salas and the other individual fled, Agents Paz and Santos pursued Montes-Salas and the other individual on foot, ultimately apprehending Montes-Salas. Montes-Salas had a cell phone in his pocket when he was apprehended.

With their lights activated, Agents Rodriguez and Yanez continued the pursuit of the pickup truck. According to the agents' testimony, the pickup truck continued to drive for five to seven miles before stopping on the shoulder of the highway and allowing several individuals to exit and flee. Some exited the back passenger door of the truck and opened the tailgate to allow others to flee. Seven were apprehended by the agents, all illegal aliens from either India or the Dominican Republic.

At the border patrol station, one alien from India asked to call his sister to tell her that he had been apprehended and prevent her from paying more money toward services no longer available. He informed Agent Rodriguez that all the arrangements for smuggling were made with "Carlos" and gave Agent Rodriguez Carlos's phone number.

At trial, Agent Rodriguez explained that guides are common in a smuggling operation and are responsible for leading people across the river and to the checkpoint. The guide would have a phone and know the contact and the area. Agent Rodriguez stated that it was common for a group to have more than one guide and that the guides often sit in the front of the vehicle for an easier escape. He said had seen similar situations with multiple bailouts. He explained that the first stop would be to separate the guides from the group, allowing the guides to escape. The guides later rejoin the group of aliens and attempt to smuggle them again. He testified that the aliens could be in the bed of the truck or in the cabin, but would be concealed. In addition, he testified about how alien smugglers are compensated and about alien smuggling routes.

Officer Frank Lozano, a state trooper with the Texas Department of Public Safety, testified that he was working on January 12, 2010 when he was advised via radio to be on the lookout for a red Dodge pickup truck. Minutes later, Officer Lozano saw the truck, now traveling 111 miles per hour in a 70 mile per hour speed zone, and chased it for seven miles. The driver then lost control, and the truck rolled several times. The driver fled but was ultimately apprehended. Officer Lozano found several backpacks inside and outside the vehicle. The rear seat was missing.

Gurcharan Singh ("G. Singh"), a citizen of India, testified that he was in the United States illegally on January 12, 2010. He left India in December 2009 and traveled through Moscow, Havana, Panama, Guatemala, and Mexico before reaching the United States. G. Singh stated that he was traveling through Mexico with a group of people being smuggled into the country. The group included five other Indians and three Dominicans. At the United States border, the group of nine aliens stayed in a room for a few days where they were brought provisions. They were then taken to the border and crossed the river by boat. The guide led them through the brush to a vehicle. The guide returned to Mexico, and the nine aliens entered the vehicle. They were taken to a house and stayed only a few minutes. There was no furniture in the house, only a young man, under 18, whom Singh identified as "Carlos."

A pickup truck arrived and transported the aliens to another house. The group remained in the house until the owner and his wife began fighting. Carlos then transported the nine aliens to a third house in two trips. Upon arriving at the third house with the second group, G. Singh saw Montes-Salas. He stated that Montes-Salas opened the door to the house, led the aliens upstairs to a room, and showed them the location of the bathroom. It was understood that the aliens were to remain in the room. The door to the room was closed and the nine aliens inside went to sleep. Montes-Salas did not sleep in the room with them. In the morning, Montes-Salas brought pizza and Cokes into the room

where the aliens had been sleeping.  After that, G. Singh did not see Montes-Salas again.

G. Singh testified that the next morning, he got into the bed of a pickup truck.  There were four aliens in the bed, and he was the last to get in.  He was covered with something like a mattress.  Shortly after the vehicle began driving, G. Singh heard sirens and noticed that the vehicle was traveling at a fast rate of speed.  The vehicle then slowed down, and he heard someone urging him to jump, and then he jumped out of the truck and fled.  He was apprehended and taken to the border patrol station.  While there, he gave the authorities Carlos's phone number.  G. Singh explained that he had used Carlos's cell phone to call his sister and therefore Carlos's number was stored on his sister's phone.

Anderson Fernandez-Del Orbe, one of the aliens from the Dominican Republic, testified that Montes-Salas spent the night outside the door to the aliens' room with Carlos, that Carlos told Montes-Salas to give the aliens blankets, and that Carlos told Montes-Salas to help him bring pizza into the aliens' room.[1]  When Fernandez-Del Orbe had first arrived at the third house, he saw Montes-Salas standing near the kitchen, eating.  Fernandez-Del Orbe had arrived with the first group, which included four people – Fernandez-Del Orbe, two other Dominicans, and one of the Indians.  The next morning, Carlos told the aliens to go downstairs, gave them bags with Gatorade and water, and put them in a truck.  Fernandez-Del Orbe was placed in the back seat area of the truck, along with three of the Indians and another Dominican, and covered with his own jacket.  After about an hour and twenty minutes, he heard the driver say there was a patrol car behind them.  Then the driver told the aliens to get ready to get out of the car, and the four aliens concealed in the back of the cabin jumped out.

---

[1] Fernandez-Del Orbe could not be located for trial, and his deposition testimony was presented to the jury.

No. 10-41167

Neither G. Singh nor Fernandez-Del Orbe could see the people in the front seats of the pickup truck.

Four aliens from the group of nine in addition to G. Singh and Fernandez-Del Orbe testified: Balraj Singh ("B. Singh"), Hitendra Kumar Manubaal-Patel, Sukhdeep Singh ("S. Singh"), and Tamish Kumar Kalidas-Patel.[2] None of them remembered seeing Montes-Salas at any point before they were arrested. In addition, none was able to see the face of anyone in the front seat of the pickup truck, though one could see someone wearing a blue jacket with a hood.

B. Singh only remembered staying in two houses after they crossed the border. B. Singh also testified that he did not remember what the young man who took them to the final house looked like, other than that he was wearing a cap. He could not remember whether he was given anything to eat or drink the next morning.

Like B. Singh, Manubaal-Patel only remembered being brought to two houses after he crossed the border. He did not see the driver who brought them to the final house and just followed "[s]ome Indian" into the house. He said they went upstairs and fell asleep, and that he never saw anyone come into the room. He testified that there were Cokes downstairs, but that he never had any. He said that no one brought him food and he did not eat or drink for two days.

S. Singh did not see who drove them to the third house or who brought the aliens food and drink. He testified that when he arrived at the third house, "[t]hey took us to a room," but when asked who took him to the room, he said he just followed his friend who was ahead of him.

Kalidas-Patel testified that he did not see who drove them from the second house to the third house. He testified that "[t]hose Spanish took us up[stairs]" and that when they were all in the room "the Spanish guy went outside" and

---

[2] Only Balraj Singh testified at trial. The other three witnesses could not be located and so their deposition testimony was presented to the jury.

6

brought the group blankets.  Kalidas-Patel testified that after he took a shower in the morning, Cokes were there.

Immigration and Customs Enforcement (ICE) Agent Anson Luna testified that he responded to the incident at the border patrol station and obtained a statement from Montes-Salas.  Montes-Salas informed Agent Luna that he paid $1,500 to be transported to California.  He was picked up in the afternoon on January 12, 2010, at his apartment in McAllen where he lived with his wife and daughter.  Montes-Salas claimed that he entered the red four-door pickup truck and remained ducked down the entire time.  He said the truck made one stop for fuel.  Montes-Salas told Agent Luna that his wife intended to pick him up across the checkpoint and take him to San Antonio where he would catch a bus to South Lake Tahoe, California.  Montes-Salas stated that his uncle knew the smuggler and paid the fee.

ICE Agent William Baer testified that he led the investigation on January 12, 2010.  Agent Baer subpoenaed the phone records from the two phones recovered from Montes-Salas and Hernandez-Torres.  Montes-Salas was identified as the cell phone subscriber on his phone, and the service area was McAllen.  Agent Baer testified that he had been told that Carlos's phone number was XXX-XXX-XXXX.[3]  He indicated that he had received this information from Agent Rodriguez, who in turn had received it from G. Singh.  The number allegedly belonging to Carlos appeared 38 times in Montes-Salas's phone records for the period of January 5-12, 2010.  On cross-examination, Agent Baer conceded that he had no personal knowledge whether the phone number actually belonged to Carlos.

In response to questioning from the government regarding the operation of alien smuggling rings, Agent Baer testified that there are many different people involved in various roles of a smuggling organization.  He stated that

---

[3] Baer's testimony identified a specific number.

No. 10-41167

there were people responsible for housing the aliens, feeding the aliens, transporting the aliens, and collecting the money. He described the use of "stash houses" and noted that smugglers typically group and move aliens of the same nationality together. Agent Baer further explained that transport vehicles, or load vehicles, normally have a guide or sometimes multiple guides in the vehicle with the driver. It would be possible for the driver and guide to not be connected to each other if a recruiter was involved. Recruiters are responsible for finding people to serve as drivers and guides. However, in Agent Baer's experience, the driver and the guide were usually connected.

The jury convicted Montes-Salas on all counts. He was sentenced to four concurrent terms of 37 months of imprisonment, to be followed by two years of supervised release. Montes-Salas filed a timely notice of appeal.

## II.

Montes-Salas now argues that Agent Rodriguez and Agent Baer offered impermissible profile testimony and that Agent Baer's statement about Carlos's phone number was inadmissible hearsay. Because Montes-Salas did not raise these issues in the district court, we review for plain error.[4]  Under the plain error standard of review, a defendant must show (1) error, (2) that is plain, and (3) that affected his substantial rights.[5] We will deem an error "plain" only if it is "so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it."[6] To demonstrate that an error affected his substantial rights, a defendant generally must show that the error was prejudicial.[7] Error is prejudicial if there

---

[4] *See United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 362 (5th Cir. 2010).

[5] *See United States v. Bishop*, 629 F.3d 462, 468 (5th Cir. 2010) (citing *United States v. Olano*, 507 U.S. 725, 731-32 (1993)).

[6] *Gonzalez-Rodriguez*, 621 F.3d at 363 (quotation marks and citation omitted).

[7] *Olano*, 507 U.S. at 734.

is a reasonable probability that the result of the proceedings would have been different but for the error.[8]  If a defendant establishes the first three elements, this court may exercise its discretion to correct the error only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."[9]  Satisfying the requirements of plain error review is "difficult, as it should be."[10]

## III.

## A.

Montes-Salas's first argument is based on circuit precedent holding that it is impermissible to establish that a defendant is a drug courier merely by establishing "similarities between [a] defendant[] and a profile."[11]  Under Rule 702 of the *Federal Rules of Evidence*, a qualified expert witness may offer reliable opinion testimony in a criminal case if specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.[12]  In the drug trafficking context, "law enforcement witnesses are thus allowed to give testimony about 'the significance of certain conduct or methods of operation unique to the drug business so long as the testimony is helpful and its relevance is not substantially outweighed by the possibility of unfair prejudice or confusion.'"[13]  However, the question of whether a defendant had the requisite

---

[8] *See United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81(2004)).

[9] *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (alteration in original) (quotation marks and citation omitted).

[10] *Id.* (quotation marks and citation omitted).

[11] *United States v. Sanchez-Hernandez*, 507 F.3d 826, 831 (5th Cir. 2007) (quotation marks and citation omitted).

[12] FED. R. EVID. 702.

[13] *Sanchez-Hernandez*, 507 F.3d at 831 (quoting *United States v. Garcia*, 86 F.3d 394, 400 (5th Cir. 1996)).

mental state for the charged offense is an ultimate issue reserved for the trier of fact.[14] Expert testimony about traffickers' use of drug couriers crosses the line into impermissible profile testimony "if it amounts to the 'functional equivalent' of an opinion that the defendant knew he was carrying drugs."[15] In addition, as we observed in *Mendoza-Medina*, "drug courier profiles 'have long been recognized as inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers,' and therefore are not admissible as substantive evidence of the defendant's guilt."[16] Testimony about the usual practices of drug smugglers may be admitted when it is not "pure profile testimony" but rather is used to rebut the defendant's innocent explanation for his behavior.[17]

To determine whether Agent Rodriguez's and Agent Baer's testimony exceeded the bounds of Rule 702, we must decide whether the agents' statements merely helped the jury interpret the evidence by providing background information about an unfamiliar business, or whether the agents offered opinions on the ultimate issues in the case.

Montes-Salas challenges Agent Rodriguez's testimony about the role of guides and the use of multiple bailouts in illegal alien trafficking:

Q And is it common for there to be more than one guide in a group?

A Yes.

Q And why is that?

---

[14] FED. R. EVID. 704(b).

[15] *Gonzalez-Rodriguez*, 621 F.3d at 363 (quoting *United States v. Gutierrez-Farias*, 294 F.3d 657, 663-64 (5th Cir. 2002)).

[16] *United States v. Mendoza-Medina*, 346 F.3d 121, 128 (5th Cir. 2003) (quoting *United States v. Williams*, 957 F.2d 1238, 1241-42 (5th Cir. 1992)).

[17] *Sanchez-Hernandez*, 507 F.3d at 833.

No. 10-41167

A Sometimes when they know we're behind them, they'll separate into two groups so they will have more chance of getting away. Another one would be -- someone will -- once they get past the Checkpoint, they'll stash them. They'll hide them somewhere near the highway and one guide will stay with them. The other one will go up to the highway and get the pickup vehicle, and they'll coordinate themselves.

Q And agent, in your -- with your experience and training, can you tell the Jury a little bit about the location in the vehicle where all of the individuals are sitting. What's important about that?

A I don't understand the question.

Q What is -- usually in a vehicle, where will the guides be?

A Oh, they would be in the front, passenger or driver, whichever.

Q And why is that?

A They would have a better chance to escape if they get stopped or anything to exit the vehicle faster, quicker.

Q And usually individuals in your experience that are being transported, where are they in the vehicle?

A They would be in the bed or in the -- inside the cabin but the individuals being transported would be piled up. They would be all on top of each other, so for a guide it would make it really difficult to get from there out, quicker.

Q And the individuals that are being transported, would they be visible to someone driving in a vehicle?

A If -- you mean the driver can see them?

Q No, meaning other cars, or other people on the road.

A No. No.

Q Would they be hidden?

11

No. 10-41167

A They would be hidden, yes.

. . .

Q And in your experience and training, have you seen it as in a situation like this where there are two different or multiple bailouts. Have you ever seen that?

A Yes.

Q And what's the significance of that?

A Multiple -- like you say one, two vehicles bailing out same -- or multiple bailouts, you mean by one stop, second stop?

Q Yes.

A The first stop, it would be, get the guides. Separate the guides from the group for the purpose of the guides get away. They will later come back and go find the group and then they will try to smuggle them again. They will spread out the group.
    Say, you're going to have two guys over here, and the group over here. They'll later get picked up – they'll get dropped off near where the group was dropped off and they'll look for them and then they'll try to smuggle them again.

Montes-Salas also challenges Agent Baer's testimony about guides:

Q Well, Agent, other than the driver who's driving the vehicle taking the aliens, who else is usually involved in the transportation of aliens?

A From my experience almost all the alien -- the transport vehicles, we call load vehicles, they normally have a guide or sometimes multiple guides in the vehicle with the driver. So when the group gets dropped off -- when the group is dropped off south of the Checkpoint they're -- of course, if they're from outside the area, outside the country, they don't know where they are so they need somebody in order to show them the way around a Checkpoint to their next pickup.

12

In addition, he challenges Baer's testimony that he had not seen a case in which the driver and guide do not know each other, that they "normally know each other," and that the role of the recruiter is to "go out and find the drivers and stuff like that."

This court has not considered whether expert testimony about illegal alien trafficking constituted impermissible profile testimony in any published opinion or where the defense alleged that the defendant was innocent because he himself was being smuggled. As with drug trafficking, however, we believe "there is a fine but critical line between expert testimony concerning methods of operation unique to the [alien smuggling] business, and testimony comparing a defendant's conduct to [a] generic profile" of someone engaged in that business.[18]

In this case, we find that most of the testimony challenged by Montes-Salas was on the safe side of that line because the "overall context" of the testimony establishes that the statements were part of the agent's "legitimate background testimony" about how an alien trafficking operation works.[19] The average juror may not be aware that illegal alien traffickers use "multiple bailouts" and "stash houses" and is likely unfamiliar with the different roles of guides, drivers, and recruiters in an illegal alien trafficking operation.[20] It was permissible for the agents to convey their "specialized knowledge . . . gained through their experience in apprehending [illegal alien traffickers] who ha[d] . . . crossed the border."[21]

---

[18] *Gonzalez-Rodriguez*, 621 F.3d at 364.

[19] *United States v. Morin*, 627 F.3d 985, 996 (5th Cir. 2010).

[20] *See, e.g.*, *Garcia*, 86 F.3d at 400 ("The average juror may not be aware that the presence of 166.9 kilograms of cocaine is indicative of a large drug trafficking organization, and may not be aware that large drug trafficking organizations commonly use 'car swaps,' 'stash houses,' and conduct 'heat runs.'").

[21] *Sanchez-Hernandez*, 507 F.3d at 832.

Proper characterization of testimony as profile or background turns on its context, including its usage at trial, and Agent Rodriguez's response to the prosecutor's question about where guides usually sit – "they would be in the front" – is more problematic. However, the ultimate characterization is not so certain that the admission of the testimony was a clear or obvious error.

"At a minimum," plain error means error that "is clear under current law."[22] Existing precedent does not establish where the line between background and profile testimony would fall in this case. In an unpublished opinion in *United States v. Hernandez-Acuna*, this court found that the district court abused its discretion when it admitted a law enforcement officer's expert testimony about the use of camioneta operations as a "front" for illegal alien smuggling operations.[23] That testimony was found to address whether the defendant knew he was transporting illegal immigrants and thus was "the 'functional equivalent' of an express comment on [the defendant's] mental state."[24] The panel noted that two Ninth Circuit cases cited by the government were distinguishable "because while the expert testimony [about illegal alien smuggling in the Ninth Circuit cases] was admitted, the agents' comments did not go to the defendants' intent, knowledge, or mental state."[25]

---

[22] *Olano*, 507 U.S. at 734; *see United States v. Bishop*, 603 F.3d 279, 281 (5th Cir. 2010).

[23] *United States v. Hernandez-Acuna*, 202 F. App'x 736, 739 (5th Cir. 2006) (unpublished).

[24] *Id.* at 741.

[25] *Id.* at 741 n.2. In *United States v. Vaca-Hernandez*, 185 F.3d 871 (Table), 1999 WL 451214 (9th Cir. 1999) (unpublished table decision), a Border Patrol special agent testified about illegal alien smuggling operations that use a "scout car" and a "load car" and the reasons why the smuggler does not drive the "load car." In *United States v. Salazar-Munoz*, 242 F.3d 385 (Table), 2000 WL 1529233 (9th Cir. 2000) (unpublished table decision), the agent's testimony concerned "the methods and tactics used by smugglers to transport undocumented aliens into the United States," in particular "the use of commercial-type vehicles such as taxi cabs, shuttles, buses, and limousines to convey the appearance of legitimacy in an otherwise illegitimate enterprise." *Id.* at *1.

Here, Montes-Salas's knowledge of the aliens' immigration status and nature of the operation in which he was involved was not at issue. Montes-Salas asserts that the agents' testimony suggested that he was a "knowing participant in the crimes charged because he was sitting in the front passenger seat of the Dodge Ram and exited . . . first," but he does not specify which elements of the charged offenses were implicated by the agents' testimony, let alone explain how the agents' testimony went to *mens rea* specifically. In addition, the testimony about the locations of guides versus illegal aliens in a smuggling vehicle rebutted Montes-Salas's "innocent" explanation for his conduct – that he was merely one of the aliens being smuggled.[26] Thus, it is not clear or obvious under current law that Rodriguez's statement about the guides was inadmissible under Rule 704(b) or that it constituted the profile evidence that we have held to be inherently prejudicial in the drug trafficking context.[27] The evidence did not go to whether Montes-Salas was in the play; it went to his role.

**B.**

Montes-Salas's second argument is that the government used inadmissible hearsay testimony to establish that Montes-Salas's cell phone records showed calls between him and the smuggler known as "Carlos." Because, like the first claim of error, this was not raised in the district court, we review for plain error only.

Under Rule 802 of the *Federal Rules of Evidence*, "Hearsay is not admissible except as provided by [the *Federal Rules of Evidence*] or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act

---

[26] *See Sanchez-Hernandez*, 507 F.3d at 833.

[27] *See, e.g.*, *id.* ("[T]he testimony was not pure profile evidence . . . . [because it] served to rebut Sanchez-Hernandez's innocent (at least as to the drug charges) explanation that he was attempting to enter the country to work and was not involved in smuggling drugs on the river that night."); *Gonzalez-Rodriguez*, 621 F.3d at 353 ("In cases involving pure profile evidence, law enforcement personnel seek to testify that because a defendant's conduct matches the profile of a drug courier, the defendant must have known about the drugs he was transporting.").

of Congress."[28] "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[29] For the purposes of the hearsay rule, "[a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."[30]

Here, three witnesses testified about Carlos's phone number. On the first day of trial, Border Patrol Agent Rodriguez testified that he allowed one of the illegal aliens to call his sister and after the phone call to the sister, the alien gave Rodriguez a phone number. According to Rodriguez, the alien indicated that the number was for the cell phone of a man named Carlos, with whom the alien had made the smuggling arrangements. Rodriguez testified that he then gave the phone number to the ICE agent on the case. Rodriguez did not state the specific telephone number that he was given for Carlos. Later that day, G. Singh testified that he had given agents Carlos's phone number – he also did not specify the number – and that he had Carlos's phone number because he had used Carlos's phone to call his sister and the number thus was saved on her phone.

On the second day of trial, ICE Agent Baer testified that he was able to match the phone number to a number in Montes-Salas's phone records. Baer testified that Rodriguez indicated he received the number from one of the material witnesses who testified at trial, and Baer said that he "was told that that number came from a known smuggler known as Carlos." Baer's cross-examination by Montes-Salas's counsel included the following exchange:

---

[28] FED. R. EVID. 802.

[29] FED. R. EVID. 801(c).

[30] FED. R. EVID. 801(a).

Q . . . . Now, you don't have any personal knowledge whether that phone number that supposedly belongs to Carlos is, in fact, Carlos' phone number, correct? I mean you don't have any personal knowledge about that.

A No, that was provided to me by Border Patrol Agent Rodriguez.

Q Right. So you don't really know whether that phone number belongs to somebody named Carlos?

A No.

Q All right. Now let's look at -- Let me backtrack a little bit. The story, or let me say the way you all got that number, Carlos' phone number, was because G[.] Singh's sister provided that number to G[.] Singh who in turn provided that number to the agent; is that your understanding?

A Yes, sir. It was understanding that the person that we know, or the person that's known as Carlos was a known smuggler who was involved in this incident. Carlos allowed the material witness Gusharon Singh to make a phone call using his cell phone. This number that ends in [XXXX] appeared in Gusharon [sic] sister's cell phone and the caller ID, the number pops up. She copied that number or saved that number and then provided it back to law enforcement, is how I understand it, or back to her brother who then in turn gave it to Border Patrol.

Q So this person Carlos lent the phone to the material witness, Gusharon Singh, made the call to the sister and then that's how his phone number was obtained?

A Right. Because the witnesses didn't have their own personal cell phones.

Agent Baer's testimony that the phone number XXX-XXX-XXXX belonged to Carlos appears to be hearsay. Baer testified that Rodriguez had given him that number for Carlos, and that Rodriguez had received the number from G. Singh's sister, via G. Singh. Contrary to Montes-Salas's claim, the record does not indicate that G. Singh's sister made an "out-of-court statement that Carlos's

phone number was [XXX-XXX-XXX]." However, Baer's testimony does indicate that G. Singh's sister stated that the phone number XXX-XXX-XXXX appeared in her cell phone when G. Singh called her. Baer's testimony regarding the ownership of XXX-XXX-XXXX was hearsay insofar as it repeated the sister's out-of-court statement about what number appeared in her phone.[31]

The government argues that Agent Baer's testimony was not hearsay because it was "offered for the limited purpose of linking co-conspirators." No such exception to the hearsay rule exists. The cases cited by the government deal with two separate hearsay exclusions, neither of which is applicable here. First, a statement is not considered hearsay if it is made by a co-conspirator during and in furtherance of the conspiracy.[32] Here, however, the out-of-court statement was by G. Singh's sister, not by a co-conspirator. Second, a statement does not fall within the definition of "hearsay" if it is not offered for the truth of the matter asserted.[33] Here the sister's out-of-court statement that the number XXX-XXX-XXXX had appeared in her cell phone was offered for the truth of the matter asserted – that this number had in fact registered in the Caller ID when G. Singh called his sister using Carlos's cell phone.

Because the sister's out-of-court statement regarding the number that appeared in her phone was clearly hearsay, Montes-Salas satisfies the first two prongs of the plain error standard on this issue, and we turn to the final two requirements of plain error review. Montes-Salas asserts that because of "the prosecutor's significant reliance on" the evidence regarding Carlos's phone number and "in light of the tenuous circumstantial evidence against [him]," the

---

[31] *Cf. United States v. Hernandez*, 166 F.3d 335 (Table), 1998 WL 841504, at *2 (4th Cir. 1998) (unpublished table decision) (holding that "Detective Gray's testimony with respect to what telephone number Thacker told him Mendoza dialed on his cellular phone was inadmissible hearsay testimony" because "[Thacker's] statement was an out-of-court statement offered to prove the truth of the matter asserted").

[32] FED. R. EVID. 801(d)(2)(E).

[33] *See* FED. R. EVID. 801(c)(2).

admission of the testimony regarding Carlos's phone number "clearly affected his substantial rights as well as the fairness, integrity, and reputation of the judicial proceedings." Montes-Salas offers no further analysis and fails to meet his burden.

First, phone records aside, the jury had ample circumstantial evidence on which to convict Montes-Salas.[34]  Both G. Singh and Fernandez-Del Orbe testified that Montes-Salas was present at the third stash house but was not part of their group of nine.  When Fernandez-Del Orbe arrived, he saw Montes-Salas standing near the kitchen, eating.  When the group including G. Singh arrived, Montes-Salas was the one who opened the door to let them in.  They followed Montes-Salas upstairs to a room holding other aliens from the group.  Everyone from the group of nine stayed in the upstairs bedroom that night, with the door closed, and it was understood that they were not supposed to step out of the room.  Montes-Salas and Carlos spent the night outside their door.  Fernandez-Del Orbe testified that Carlos directed Montes-Salas to give the group blankets and later told Montes-Salas to help him bring in pizza for group.  G. Singh testified that Montes-Salas gave the group pizza and Cokes.

In addition, Agents Rodriguez, Santos, and Paz saw Montes-Salas sitting in the passenger seat of the pick-up truck that was smuggling the aliens.  Agents also observed that Montes-Salas and the driver were speaking but not looking at each other, and that Montes-Salas and a younger, smaller man (presumably Carlos) bailed out before any of the aliens in the group of nine.  As the

_____

[34] Montes-Salas has not specified which elements of the counts against him would be implicated if the hearsay evidence were disregarded, but, presumably, the evidence of phone calls between Montes-Salas and Carlos would go to the first element of each of the two conspiracy charges, that is, that Montes-Salas and at least one other person made an agreement to unlawfully transport aliens and an agreement to conceal or harbor aliens.  As the district court instructed the jury, the government was not required to prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. *See, e.g.*, *United States v. Freeman*, 434 F.3d 369, 376 (5th Cir. 2005) ("[I]t is well-settled that the government does not need to show that the conspiratorial agreement was explicit or formal--proof of a tacit agreement is sufficient.").

government pointed out in its closing, of those apprehended by the Border Patrol agents, only Montes-Salas and the driver had cell phones. The government also highlighted the inconsistencies between Montes-Salas's post-arrest statement and the testimony of witnesses at trial. While Montes-Salas claimed he had been picked up at 1:00 p.m. by the red pick-up truck, two of the aliens testified that Montes-Salas was present in the third stash house when they arrived and that he was present there the next morning. Only Montes-Salas claimed that the red pickup had stopped for gas once. The agents testified that they saw Montes-Salas sitting up in the front of the truck cabin; Montes-Salas claimed he was crouching down.

Second, Montes-Salas's argument that the government significantly relied on the hearsay testimony regarding Carlos's phone number in its closing argument is without record support. In its initial closing statement, the government did not mention Carlos's phone number or the phone calls between Carlos and Montes-Salas. The evidence of the phone calls was first highlighted by defense counsel, who spent a good portion of her closing argument explaining why the calls demonstrated that Montes-Salas was innocent of the charged offenses. The government addressed the phone calls only in rebuttal.

Third, this is not a case in which the defense "arduously tried to prohibit any reference to [Carlos's phone number] during trial."[35] On cross-examination, Agent Baer admitted that his understanding that phone number XXX-XXXX-XXXX belonged to Carlos was not based on his personal knowledge. After *eliciting* that admission, defense counsel made no objection. Instead, the defense attempted to use the evidence of the phone calls to Montes-Salas's advantage. The defense noted during closing argument that the only individuals in the case who had Carlos's phone number were Montes-Salas and G. Singh and suggested

---

[35] *United States v. Escobar*, 674 F.2d 469, 475 (5th Cir. 1982) (reversing for plain error where "[t]here was no hint that defense counsel deliberately avoided making proper objections in an attempt to later sandbag the prosecution").

20

that the number thus must have been used by people who were being transported in order to get touch with their smuggler. The defense also pointed out that between calls to Carlos, Montes-Salas was calling his wife, which suggested that Montes-Salas was trying to coordinate arrangements to be smuggled further north. Defense counsel's attempt to use the phone records to Montes-Salas's advantage was a strategic choice, and an understandable one – Montes-Salas has not disputed that XXX-XXX-XXXX was Carlos's phone number. Indeed, if the prosecution had been unable to rely on Baer's testimony that Carlos's phone number was XXX-XXX-XXXX, it might have called G. Singh's sister as a witness and elicited the same testimony from her. Plain error is not a cover for "remain[ing] quiet during the trial in hope of a favorable verdict, but, when that fails to materialize, . . . resort[ing] 'to appeal on errors that might have easily been corrected by objection at trial.'"[36]

In sum, examined "in the context of the entire case,"[37] admission of Baer's hearsay testimony was not prejudicial and does not seriously affect the fairness, integrity, or reputation of this proceeding. The unobjected-to hearsay was competent evidence that the jury was entitled to weigh in reaching its verdict.[38] Montes-Salas has not demonstrated that the admission of the testimony was reversible plain error.

---

[36] *United States v. Habel*, 613 F.2d 1321, 1327-28 (5th Cir. 1980); *see, e.g.*, *Mendoza-Medina*, 346 F.3d at 131-132 ("Warzecha's testimony regarding statements Ramirez made to other officers does appear to be double hearsay. . . . However. . . . [b]ecause the Government could have elicited the same testimony from the interviewing agent, and defense counsel likely preferred Agent Warzecha instead, the admission of Warzecha's testimony recounting Ramirez's statements did not affect the fairness, integrity, or public reputation of this proceeding and we decline to find plain error.").

[37] *Mendoza-Medina*, 346 F.3d at 132.

[38] *See, e.g.*, *Huss v. Gayden*, 571 F.3d 442, 466 n.11 (5th Cir. 2009) (Higginbotham, J., dissenting).

## IV.

Montes-Salas has not shown that the district court's admission of law enforcement officers' expert testimony was a clear or obvious error. The district court's admission of Agent Baer's hearsay testimony, while a clear error, did not affect Montes-Salas's substantial rights or seriously affect the fairness, integrity, or public reputation of judicial proceedings. The conviction is AFFIRMED.