# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 26, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30421

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Curtis Johnson, Jr.,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CR-201-3

_____

Before Graves, Higginson, and Ho, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Curtis Johnson, Jr. appeals his convictions related to an armed robbery resulting in the death of Hector Trochez, an armored truck guard, making a bank delivery. Finding no reversible error, we AFFIRM.

I.

Johnson was charged with conspiracy to obstruct commerce by robbery (18 U.S.C. § 1951(a)); obstruction of commerce by robbery (*id.* § 1951(a)); and using, carrying, brandishing, and discharging firearms during and in relation to a crime of violence, causing death (*id.* §§ 924(c)(1)(A),

924(j)(1)).   Johnson was charged alongside: Jeremy Esteves; Robert Brumfield, III; Chukwudi Ofomata; Lilbear George; and Jasmine Theophile.

We briefly describe the government's trial proof.  Ofomata stored firearms at the home of witness Cedric Wade and retrieved the firearms on the morning of the robbery.  Esteves drove a stolen vehicle with Johnson, Ofomata, and George to the bank parking lot.  George exited the vehicle, approached the guard, Hector Trochez, who was outside an armored truck, and began shooting.  Ofomata then exited the vehicle and also began shooting at Trochez and, almost simultaneously, Johnson exited the vehicle and began shooting at the truck when it appeared a second guard was going to exit the truck.  The assailants fled.  Trochez died on the scene from a gunshot wound.  The government never purported to be able to identify which of the three shooters fired the fatal shot.

The government noticed its intent to seek the death penalty against the three defendants charged with firing firearms during the robbery—Johnson, George, and Ofomata—which it later withdrew.  The district court severed the trial of the then-capital defendants.  Johnson's first trial, in July 2021, ended in a mistrial after the jury could not reach a verdict.  At his retrial in March 2022, a jury convicted Johnson of each of the three counts charged.  Johnson timely appealed.

## II.

First, Johnson contends that the government, in closing, committed the "prosecutor's fallacy" by equating the random match probability of a

partial DNA sample with the probability that the defendant was not the sample's source.

At Johnson's second trial, the government introduced expert testimony about a partial DNA sample obtained from a bandana found in the vehicle used in the robbery.  Testing yielded inclusionary match statistics capturing the probability that the sample was Johnson's as compared to a coincidental match of an unrelated person, and the lowest inclusionary match statistic had an error rate of one in 4,100. That is, the expert explained, only one in 4,100 people would match the sample as strongly as Johnson did.  But, in the government's first closing argument, the prosecutor said that Johnson "left very little DNA, but he left just enough to prove that it was him in the front seat when you combine the 1 in 4,100 chance that it's not him." Johnson did not object.

The prosecutor's fallacy occurs when "a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability)." *McDaniel v. Brown*, 558 U.S. 120, 128 (2010).  Conflating these two probabilities, as the prosecutor did here, yields "an erroneous statement that, based on a random match probability of 1 in 10,000, there is a 0.01% chance the defendant is innocent or a 99.99% chance the defendant is guilty." *Id.*

We review the unobjected-to remark for reversible plain error.  *See United States v. Gracia*, 522 F.3d 597, 599-600 (5th Cir. 2008).  "To

demonstrate reversible plain error, [Johnson] ha[s] to show that (1) there is error; (2) it is plain; and (3) it affected his substantial rights." *Id.* at 600. There is no question that this remark was erroneous. To be plain, "the legal error must be clear or obvious, rather than subject to reasonable dispute." *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012). Establishing that it affected Johnson's substantial rights requires showing that "there is a reasonable probability that the result of the proceedings would have been different but for the error." *United States v. Montes-Salas*, 669 F.3d 240, 247 (5th Cir. 2012). "Even if he could meet that burden, [this court] still would have discretion to decide whether to reverse, which [it] generally will not do unless the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Gracia*, 522 F.3d at 600 (citations omitted).

"[T]he determinative question is whether the remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Anderson*, 755 F.3d 782, 797 (5th Cir. 2014) (internal quotation marks and citation omitted). The answer, here, is no. We "look at the comment in context." *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) (internal quotation marks and citation omitted). The statistic was stated correctly by the prosecution, defense counsel, and the expert witness numerous times, and, after the government's first closing argument, defense counsel properly stated the statistic and emphasized that this was significantly weaker than the DNA evidence presented against other defendants. Even in rebuttal, the prosecutor stated that "1 in 4100 actually has some significance," explaining

"that there's a probability that [Johnson] is someone who left that DNA behind" so "you have to be open-minded to the fact that, well, maybe it is Curtis Johnson who was there." The prosecutor continued that "if you don't like that statistic—and I don't love the statistic—I've got to look at all the other facts."

Contrary to Johnson's contention that "[t]he impact of the prosecutor's error cannot be underestimated, given the fairly incomprehensible nature of" the expert's testimony, Johnson Br. 7, the expert clearly explained the relevant statistic. For example, she explained that the conclusion was that "it's 4,100 people you would have to go through before you may find someone with that match statistic or higher." The expert answered "yes" in response to defense counsel's question that "[e]ven in a city like New Orleans, there could be hundreds of people with that same . . . partial DNA match that you were using, correct?"

Furthermore, we reject Johnson's assertion that his substantial rights were affected "because the government's case was almost entirely premised on DNA evidence." Johnson Br. 8-9. The government also presented eye-witness testimony that, on the morning of the robbery, Johnson helped Ofomata load a bag of firearms into the vehicle used in the robbery, and, as discussed below, the government properly introduced a statement from a non-testifying co-defendant that Johnson was one of the shooters who emerged from the vehicle.

III.

Second, Johnson contends that the district court erred in admitting the statement of Johnson's co-defendant, George, through testimony of government informant Jamell Hurst, because it was not within Federal Rule of Evidence 804(b)(3)'s hearsay exception for statements against interest by unavailable witnesses.

At Johnson's second trial, Hurst testified about a conversation he had with his friend George in early 2014 after a sketch of a person of interest was published.  George asked Hurst whether the sketch looked like himself, Johnson, Ofomata, or Esteves.  Hurst testified that George told him that:

> [W]hen he first was there and the armored truck arrived or whatever, he said they was in the car debating on who was going to jump out first. He was like "F it, I'm going to go first" and he jumped out and he said—he said he jumped out and told the guy, like letting him know he was getting robbed, and instead of the guy like trying to give up the money, he went straight for his gun and he said he started shooting and he was trying to like maneuver out the way, so he wouldn't get shot while he was shooting; and he said that's when [Ofomata] hopped out and started shooting at the guy, too. He was like I don't know who killed him, me or [Ofomata], but both of us was shooting. One of us must have shot the person, too, and he said that's when [Johnson] jumped out and started shooting at the truck, so the person in the truck wouldn't get out and try to help.

Johnson did not object.

"[I]n the absence of a proper objection, we review only for plain error." *United States v. Avants*, 367 F.3d 433, 443 (5th Cir. 2004).  Johnson contends that "it appears to be an open question as to whether Johnson's pretrial objections and objection in his *first* trial preserved the issue for

appeal" following his *second* trial, Johnson Reply Br. 2 (emphasis added), but Johnson did not even object to the statement at his first trial.[1] Johnson must therefore "show (1) error, (2) that is plain, and (3) that affected his substantial rights," such that "there is a reasonable probability that the result of the proceedings would have been different but for the error." *Montes-Salas*, 669 F.3d at 247. Even so, this court will exercise its discretion to correct a plain error "only if [it] seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and alterations omitted).

To be admissible under Federal Rule of Evidence 804(b)(3) as a statement against the penal interest of an unavailable declarant:

> (1) The declarant must be unavailable; (2) The statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) The statement must be corroborated by circumstances clearly indicating trustworthiness.

*United States v. Ebron*, 683 F.3d 105, 133 (5th Cir. 2012) (citing *United States v. Dean*, 59 F.3d 1479, 1492 (5th Cir. 1995)).

---

[1] Instead, Johnson objected at the first trial to Hurst's testimony about the statement of a different co-defendant (Brumfield) at a different point, to the effect that Brumfield and unnamed others planned to commit a robbery. Separately, during pre-trial litigation for the first trial, Johnson moved to sever, based in part on Confrontation Clause grounds related to George's statements, including those George made to Hurst that are now challenged on appeal. Johnson's motion noted that "[t]hese statements are also inadmissible hearsay that do not qualify under a hearsay exception as to codefendant[] Johnson . . . ." The district court denied the motion to sever but explained that Johnson could re-urge the arguments in the motion at trial. He did not.

Johnson concedes George's unavailability.  As to the second prong, Johnson asserts only that "George, while admitting some personal responsibility, also placed blame on alleged accomplices."  Johnson Br. 10.  George did not shift blame from himself: he subjected himself to criminal liability by stating that he was the first shooter at the crime scene, and, while George said that he did not know who fired the fatal shot, he did say that he was shooting.

On the third prong, Johnson relies on *Williamson v. United States* to attack the trustworthiness of statements of co-defendants.  512 U.S. 594, 601 (1994).[2]  Importantly, George did not make these statements in a custodial context—unlike the *Williamson* declarant—but rather made them as a friend, and thus there were not "the same set of incentives that create the risk of an unreliable statement."  *Ebron*, 683 F.3d at 133.  Furthermore, there were various pieces of corroborating evidence, including George's statement to Hurst in another conversation, after the publication of another article reporting that DNA evidence was found at the crime scene, that his "life [was] over"; Wade's testimony that, approximately an hour before the robbery, Ofomata drove to Wade's house to pick up a bag of firearms, which Wade saw Johnson assist Ofomata in loading into the vehicle used in the robbery before getting back into the vehicle; and the testimony of the second guard—confirmed by surveillance video—that three individuals emerged

_____

[2] Johnson's arguments otherwise largely go to Hurst's credibility as a witness.

from the vehicle, one rushing toward the money, another shooting at Trochez, and a third shooting at the truck.

As to the effect on his substantial rights, Johnson contends only that "Hurst's testimony related to George's statements was essentially the only testimony that placed Johnson as a participant in the armed robbery." Johnson Br. 12. But given the evidence just discussed, *supra*, Johnson's vague assertion does not establish that "there is a reasonable probability that the result of the proceedings would have been different but for the error." *Montes-Salas*, 669 F.3d at 247.

## IV.

For the foregoing reasons, we AFFIRM.