# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2023

Lyle W. Cayce
Clerk

————————

No. 22-20515

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

James Darian Pierre,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CR-414-1

_____

Before Jones, Stewart, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

A jury convicted James Pierre of multiple federal drug crimes for his work as the sole doctor at a Houston pill mill. *See, e.g.*, *United States v. Evans*, 892 F.3d 692, 696 (5th Cir. 2018) (defining a "pill mill" as "an operation that prescribes drugs with no legitimate medical purpose"). On appeal, Pierre presses two arguments that he failed to preserve at trial: namely, that the district court committed error in admitting improper profiling evidence and in instructing the jury. Finding no reversible error, we AFFIRM.

No. 22-20515

## I.

Houston's West Parker Medical Clinic was an illegal pill mill posing as a pain management clinic. Pierre was West Parker's only physician. In 2020, he was indicted by a grand jury for various federal drug crimes.[1] Several of Pierre's co-conspirators—including West Parker's owner, Rhonda Walker—cut plea deals. Pierre maintained his innocence and went to trial.

Walker testified at trial that West Parker was a "pill mill." She and others described its operations. The clinic took no appointments and capped patients at 45 per day. Patients would congregate outside the clinic as early as 2 a.m. before it opened at 7 a.m. Once inside, patients were required to turn off their cell phones (to prevent their recording what went on) and were forbidden from exchanging cash in the lobby. They had to fill out their own intake forms, indicating the drugs they wanted, and they paid before seeing Pierre or his physician's assistant. Pierre insisted that Walker enforce these rules.

West Parker accepted neither insurance nor credit cards. Cash only. A hydrocodone prescription went for $220; oxycodone, $500. Both came with a prescription for carisoprodol, which, when mixed with hydrocodone, makes a "Las Vegas cocktail." Walker pre-filled prescription forms, including the patient's diagnosis. This was easy to do because most patients received the same prescription for the same ailment: back pain from a car accident. After a cursory examination by Pierre, patients were sent on their way with prescriptions in hand.

_____

[1] Pierre was charged with seven counts of unlawfully distributing and dispensing controlled substances and one count of conspiring to do the same. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C); 21 U.S.C. § 846.

No. 22-20515

Patients were often recruited and brought in by "runners," who would resell the drugs on the street. For instance, one runner's wife, Charlotte Yarborough, testified that her husband regularly drove her and others to West Parker from three hours away in Palestine, Texas. He gave recruits cash to pay West Parker, paid them $100 for their prescriptions, and then resold the drugs. Pierre and his staff often discussed these runners. Pierre would direct Walker to have runners leave the waiting room and "go back to . . . their car," or "leave the patient . . . and come back and get them." Sometimes, things got out of hand. A post-it note on one file reported: "Patient was brought in by [a] Runner who broke windows on [*sic*] clinic."

Pierre performed well. Walker described him as a "beast" of a prescriber to Henry Reece, a headhunter who initially connected Walker and Pierre. (Unbeknownst to Walker, Reece was recording their conversation.) Later, Pierre asked Reece how much hydrocodone and oxycodone sold for on the streets. When Reece told him, Pierre mused "he may not be charging enough." Nonetheless, Pierre was well compensated. Walker paid him between $6,500 and $8,000 per week, all in cash. All told, in his thirteen months at West Parker, Pierre issued 9,115 hydrocodone prescriptions (totaling 1,068,783 pills) and 6,633 carisoprodol prescriptions (totaling 595,410 pills).

Pierre did not meaningfully challenge this extensive evidence. Rather, his defense was that Walker and other clinic employees "deceive[d]" him. He claimed he had only "provid[ed] medicine for people that he believed were in pain," but the patients had "lie[d] to [Pierre] [to] get these particular pills and put them on the street." The jury did not believe him. Pierre was convicted on all counts and later sentenced to 150 months in prison, followed by three years of supervised release. He was also ordered to forfeit his BMW.

No. 22-20515

## II.

Pierre raises two issues on appeal. First, he claims the district court erred by admitting "profiling" testimony. Second, he claims the jury instructions were erroneous under *United States v. Ruan*, 142 S. Ct. 2370 (2022). Ordinarily, we would review evidentiary objections for abuse of discretion and jury instruction issues involving statutory construction *de novo*. *See United States v. Meyer*, 63 F.4th 1024, 1040 (5th Cir. 2023); *United States v. Ajayi*, 64 F.4th 243, 247 (5th Cir. 2023) (per curiam). But Pierre preserved neither argument at trial,[2] so we review both questions for plain error only.[3] *See United States v. Richard*, 775 F.3d 287, 295 (5th Cir. 2014); *United States v. Green*, 47 F.4th 279, 294 (5th Cir. 2022); Fed. R. Crim. P. 52(b). Pierre must therefore show not merely error, but "clear or obvious" error that affected his substantial rights. *United States v. Vasquez*, 899 F.3d 363, 373 (5th Cir. 2018). To do so, he must show that, but for the district

---

[2] We reject Pierre's contention that he preserved both arguments. As to the evidentiary claim, Pierre objected to some of the evidence but not on the basis he now presses on appeal. *See, e.g.*, *United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015) (explaining "[t]o preserve error, an evidentiary objection must 'state[] the specific ground, unless it was apparent from the context'"). Pierre's reply brief concedes plain error review governs this issue. As to the jury instructions, Pierre objected only to including an aiding-and-abetting instruction but not on the grounds he now argues. His claim that he preserved error merely by proposing adequate instructions, without requesting they be given, is unavailing. *See United States v. Green*, 47 F.4th 279, 294 (5th Cir. 2022) (proposed jury instructions do not preserve error, absent request they be given or objection to their exclusion at charge conference), *cert. denied*, 143 S. Ct. 747 (2023), *and cert. denied sub nom. Selgas v. United States*, 143 S. Ct. 1058 (2023).

[3] Pierre argues for *de novo* review of the jury instructions based on the "futile gesture" doctrine—meaning a *Ruan*-type objection would have been pointless, given that his trial occurred before *Ruan*. We disagree. "[F]utility is not an excuse in the plain-error context." *United States v. Vargas-Soto*, 35 F.4th 979, 996 n.5 (5th Cir. 2022) (citing *Greer v. United States*, 141 S. Ct. 2090, 2099 (2021)), *cert. denied*, 143 S. Ct. 583 (2023)); *see also United States v. Capistrano*, 74 F.4th 756, 769 (5th Cir. 2023) (explaining plain error review applies where defendant did not object to instructions pre-*Ruan*).

court's error, "there is a 'reasonable probability' that he would have been acquitted." *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). Even then, we will exercise our discretion to correct such an error only if it "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Huntsberry*, 956 F.3d 270, 283 (5th Cir. 2020) (citation omitted).

## A.

Pierre argues that the voluminous trial testimony concerning West Parker's illicit operations should have been excluded as impermissible "profiling" testimony. We disagree.

Pierre tries to leverage our cases teaching that a defendant may not be convicted merely because he fits a "drug courier profile." *See, e.g.*, *United States v. Ramos-Rodriguez*, 809 F.3d 817, 825 (5th Cir. 2016) (per curiam) (citation omitted). In such cases, "law enforcement personnel seek to testify that because a defendant's conduct matches the profile of a drug courier, the defendant must have known about the drugs he was transporting." *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010). A "classic" example is using testimony that "drug couriers generally have no criminal history" to prove that a defendant "knew he was carrying drugs *because* he had no criminal history." *Id.* at 366 (emphasis added). Such evidence is inadmissible because it is overinclusive and unfairly prejudicial. *Id.* at 364; *see also Ramos-Rodriguez*, 809 F.3d at 825 (explaining "drug courier profile evidence is inadmissible to prove substantive guilt based on similarities between defendants and a profile") (citation omitted).

The problem for Pierre, though, is that the testimony about West Parker's operations was not profiling evidence. To the contrary, law-enforcement witnesses explained how pill mills operate because, otherwise,

the jury would have had trouble understanding the evidence.[4] Such testimony about the mechanics of drug trafficking is admissible. *See United States v. Staggers*, 961 F.3d 745, 761 (5th Cir. 2020) (explaining "agents testifying as lay witnesses 'may testify about the significance of particular conduct or methods of operation unique to the drug business'") (quoting *United States v. Espino-Rangel*, 500 F.3d 398, 400 (5th Cir. 2007)).[5] Nor does Pierre point to any testimony where a witness opined about Pierre's mental state based merely on evidence of how pill mills generally operate—a hallmark of profiling testimony. *Cf. United States v. Morin*, 627 F.3d 985, 995 (5th Cir. 2010) (explaining that an officer may not "offer[] a direct opinion as to the defendant's mental state or . . . give[] the 'functional equivalent' of such a statement") (citation omitted). Indeed, there was ample direct evidence from which a jury could have inferred Pierre's guilty knowledge. For example, Walker testified that Pierre knew of the presence of runners at West Parker and insisted she enforce rules aimed at concealing West Parker's illegal operations.

---

[4] Specifically, Officer Nathaniel Taylor, who had conducted an undercover operation at West Parker, explained the significance of West Parker's various rules. Diversion Investigator Stella Butler discussed red flags characteristic of pill mills. Task Force Officer Ruben Espinoza explained the significance of pre-filled prescription forms. And Diversion Officer Michael Mills explained summary exhibits he prepared about West Parker's prescriptions, which showed the high percentage of West Parker patients who complained of back pain from a car accident. Though not law enforcement officers, Pierre also argues that similar testimony from Walker, West Parker's former security guard, and the government's medical expert was profiling testimony.

[5] *See also United States v. Garcia*, 86 F.3d 394, 399–400 (5th Cir. 1996) (explaining that "[t]he average juror may not be aware that . . . large drug trafficking organizations commonly use 'car swaps,' 'stash houses' and conduct 'heat runs'"); *United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994) (approving an officer's "analysis of the evidence in the light of his special knowledge as an expert in the area of narcotics trafficking").

No. 22-20515

A deeper problem for Pierre is that we are on plain error review. He identifies no drug profiling case in the context of pill mills. Most profiling cases concern drug couriers and ask whether the government proved the defendant knew he was carrying narcotics. *See, e.g.*, *Gonzalez-Rodriguez*, 621 F.3d at 364. Pierre's situation is different. The issue is not whether Pierre knew he was prescribing controlled substances—he did—but whether he knowingly did so without a legitimate medical purpose. *See* 21 U.S.C. § 841(a); 21 C.F.R. § 1306.04. In effect, Pierre would have us declare it "obvious" error not to transplant our profiling cases into a realm where they fit awkwardly, if at all. That argument fails. *See United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010) ("An error is not plain under current law if a defendant's theory requires the extension of precedent.") (cleaned up).[6]

In sum, Pierre fails to show that the district court committed error, plain or otherwise, by not excluding testimony about West Parker's operations as profiling evidence.

B.

Pierre next argues that the jury instructions were erroneous under the Supreme Court's decision in *Ruan*, 142 S. Ct. 2370. We agree with the government that any error in the instructions did not affect Pierre's substantial rights.

---

[6] True, we have applied our profiling precedents to cases where a defendant is charged with transporting illegal aliens and claims ignorance of his passengers' immigration status. *See United States v. Hernandez-Acuna*, 202 F. App'x 736, 741 (5th Cir. 2006) (per curiam). But those cases are close analogues to the drug courier cases because they probe whether a defendant knows he is transporting something (or someone) illegal. *See United States v. Montes-Salas*, 669 F.3d 240, 250–51 (5th Cir. 2012) (explaining our profiling caselaw did not apply on plain error review to a scenario where a defendant's "knowledge of the aliens' immigration status" was not at issue).

Pierre was convicted under 21 U.S.C. § 841, which, as relevant here, makes it a crime to "knowingly or intentionally" dispense controlled substances "[e]xcept as authorized." Pierre was also convicted for conspiring to violate § 841 under 21 U.S.C. § 846. *Ruan* held that § 841's *mens rea* ("knowingly or intentionally") applies to the "except as authorized" clause. 142 S. Ct. at 2382. Accordingly, the government must prove the defendant "knowingly or intentionally acted in an unauthorized manner." *Ibid.*; *see also Ajayi*, 64 F.4th at 247 (explaining that, under § 841, "the defendant must subjectively understand the illegitimate nature of the distribution [he] facilitate[s]" and that "[f]illing an objectively illegitimate prescription is not a sufficient condition to convict") (citing *Ruan*, 142 S. Ct. at 2381).

The jury was instructed that, to convict Pierre on the substantive § 841 counts, it had to find "[1] that Pierre distributed or dispensed a controlled substance; [2] that he did so knowingly and intentionally; and [3] that he did so other than for a legitimate medical purpose or did so outside the usual course of professional practice."[7] Pierre argues these instructions fail under *Ruan* because they did not ask the jury to find he subjectively understood the prescriptions were unauthorized. *See Ajayi*, 64 F.4th at 247.

The government agrees with Pierre on this point. Nonetheless, it argues that the jury instructions were adequate as a whole because the § 846 conspiracy instructions required the jury to find that Pierre acted with the *mens rea* required by *Ruan*. For support, the government points to our recent *Ajayi* decision, where we concluded that adequate § 846 conspiracy

---

[7] The latter phrase comes from an accompanying regulation, which provides that prescriptions are "authorized" when a doctor "acting in the usual course of his professional practice" issues them "for a legitimate medical purpose." 21 C.F.R. § 1306.04(a); *see also Ruan*, 142 S. Ct. at 2382.

instructions "filled any gap [in the § 841 instructions] by clearly requiring that the jury find that Ajayi ha[d] understood the illegitimate nature of his conduct." *Ajayi*, 64 F.4th at 248. In response, Pierre contends that *Ajayi* is inapposite because the defendant there conceded the adequacy of the conspiracy instructions, whereas Pierre challenges them. *Ibid.*

We need not decide whether Pierre has shown clear and obvious error in the jury instructions, however, because he has not shown that any such error affected his substantial rights. *See, e.g., United States v. Dixon*, 273 F.3d 636, 640 (5th Cir. 2001). This is because there was "overwhelming evidence" that Pierre understood the illegitimacy of his actions. *Ibid*; *see also United States v. Little*, No. 21-11225, 2023 WL 7294199, at *14–*15 (5th Cir. Nov. 3, 2023) (finding *Ruan*-error did not affect defendant's substantial rights); *United States v. Heaton*, 59 F.4th 1226, 1242 (11th Cir. 2023) (finding *Ruan*-error harmless).

There was no question that West Parker was a pill mill. Moreover, the evidence showed that, before Walker hired Pierre, she explained its operations to him in detail and conveyed her expectations as to the quantity of drugs he was to prescribe. And once Pierre began working at West Parker, he exceeded those expectations, earning Walker's praise as a "beast" of a prescriber. Furthermore, the examinations Pierre conducted on patients were cursory and he also used the prescription forms that Walker pre-filled.

Pierre's examinations of Yarborough and a patient called "J.C." were characteristically superficial. On Yarborough's numerous trips to West Parker, she would indicate which drugs she sought and pay for them before seeing Pierre. Pierre's "examinations" consisted merely of seeing how far she could bend over, after which he would send her on her way with the prescriptions she wanted. Furthermore, Pierre ignored the clear signs of drug-seeking behavior Yarborough exhibited. For instance, Yarborough's

intake forms plainly stated that she lived three hours away in Palestine, Texas. But Pierre never asked her why she didn't see a doctor closer to home.

J.C.'s patient profile contained similar red flags. He had received hydrocodone and carisoprodol prescriptions from thirteen different providers before coming to West Parker. And he received another opioid prescription from a fourteenth doctor in between visits to West Parker, which violated his pain management agreement with West Parker. Yet Pierre never sought J.C.'s medical records from these prior providers, nor did he require J.C. to take a urine test before prescribing him more hydrocodone and carisoprodol.

Beyond Pierre's interactions with particular patients, trial testimony established that Pierre was intimately involved in West Parker's illicit operations. Pierre knew that runners brought patients to the clinic. He even recognized specific runners who came every day. Pierre would direct Walker to have the runners leave the clinic during their patients' appointments and await West Parker's call to return for them. Sometimes Pierre instructed the runners himself. Pierre also required West Parker staff to enforce the clinic's other rules aimed at concealing its illegitimacy—such as the requirements that cell phones be turned off and that patients refrain from passing cash in the lobby. And his question to Reece about the black market value of hydrocodone and oxycodone suggested he knew that the drugs he prescribed were destined for resale on the street.

Moreover, as the government notes, the parties presented the case to the jury as turning on Pierre's subjective knowledge of the illegitimacy of his prescriptions. The government argued Pierre "knew that the Norco prescriptions were issued with no legitimate medical purpose and outside of the usual course of medical practice." And Pierre's defense was not that his

prescriptions were in fact medically legitimate, but that his patients and West Parker staff alike had tricked him into issuing them.

In sum, the jury was presented with "overwhelming evidence" that Pierre knew the prescriptions he was writing were medically unauthorized. *See Ruan*, 142 S. Ct. at 2382; *Dixon*, 273 F.3d at 640. Likewise, the evidence plainly demonstrated that Pierre agreed to write those unauthorized prescriptions to advance West Parker's unlawful purpose. *Dixon*, 273 F.3d at 640; *Ruan*, 142 S. Ct. at 2382. So, Pierre cannot show that any error in the jury instructions as to the requisite *mens rea* affected his substantial rights. *See Little*, 2023 WL 7294199 at *14–*15; *Heaton*, 59 F.4th at 1242.[8]

## III.

For the foregoing reasons, the judgment is AFFIRMED.

---

[8] Pierre also contends it was error to ask the jury whether he agreed to unlawfully dispense drugs "outside the scope of professional practice *or* without a legitimate medical purpose." Pierre claims the "or" should have been "and." We disagree. The relevant regulation requires a prescription to have been "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). So, the "or" correctly conveyed what the regulation provides: a prescription can be invalid because it was not issued for a legitimate purpose *or* because the doctor was acting outside his usual practice.